**UNITED STATES of America, Appellee,**

v.

**Armand P. D'AMATO, Defendant–Appellant.**

No. 1440, Docket 93–1756.

United States Court of Appeals, Second Circuit.

Argued June 7, 1994.

Decided Oct. 31, 1994.

As Amended Nov. 15, 1994.

---

John L. Warden, New York City (Robert J. Giuffra, Jr., Sullivan & Cromwell, Stephen P. Scaring, Stephen P. Scaring, P.C., Garden City, NY, of counsel), for defendant-appellant.

Miriam R. Best, Asst., U.S. Atty., E.D.N.Y., Brooklyn, N.Y. (Zachary W. Carter, U.S. Atty., Peter A. Norling, David C. James, Asst. U.S. Attys., E.D.N.Y., Brooklyn, N.Y., Joshua R. Hochberg, Sr. Litigation Counsel, Fraud Section, U.S. Dept. of Justice, Washington, DC, of counsel), for appellee.

Peter C. Hein, George T. Conway III, Arthur L. Liman, New York City, G. Robert Witmer, Jr., New York State Bar Ass'n, Albany, NY, Gerald M. Labush, Nat. Assn of Crim. Defense Lawyers, New York City, William I. Aronwald, New York State Ass'n of Crim. Defense Lawyers, Garden City, NY, Austin V. Campriello, Richard A. Greenberg, New York Crim. Bar Ass'n, Stephan H. Peskin, New York State Trial Lawyers Ass'n, New York City, for amici curiae New York State Bar Ass'n, Nat. Ass'n of Crim. Defense Lawyers, New York State Ass'n of Crim. Defense Lawyers, New York Crim. Bar Ass'n, and New York State Trial Lawyers Ass'n.

Arthur N. Eisenberg, New York Civ. Liberties Union Foundation, Burt Neuborne, New York City, for amicus curiae New York Civ. Liberties Union.

Before: WINTER and JACOBS, Circuit Judges, and POLLACK, District Judge.[*]

WINTER, Circuit Judge:

Armand P. D'Amato appeals from his conviction by a jury before Judge Mishler.

D'Amato was convicted of seven counts of mail fraud in violation of 18 U.S.C. § 1341 and sentenced principally to a term of five months imprisonment, two years of supervised release including five months of home detention, and payment of $7,500 restitution. D'Amato's conviction arises from services he provided to the Unisys Corporation ("Unisys").[1] The government claimed at trial that D'Amato was hired by a "rogue" Unisys employee, Charles Gardner, and that D'Amato, with Gardner's aid, defrauded Unisys in two ways. First, the government maintained that D'Amato committed mail fraud by structuring his billings to conceal from those in control of corporate funds the nature of his relationship with Unisys and the fact that his actual services involved lobbying his brother, a United States Senator and member of the Senate Appropriations Committee. We will style this theory the "right to control theory." The government maintained, second, that D'Amato committed mail fraud by contracting with Unisys to provide written reports on Senate proceedings while never intending to provide those reports. We will style this theory the "false pretenses theory."

Because the evidence of criminal intent was insufficient on either theory, we reverse the judgment of conviction and order the indictment dismissed.

## BACKGROUND

We of course view the evidence in the light most favorable to the government and draw all reasonable inferences in its favor. *United States v. Nersesian,* 824 F.2d 1294, 1302 (2d Cir.), *cert. denied,* 484 U.S. 957, 108 S.Ct. 355, 98 L.Ed.2d 380 (1987). In light of this standard, a rational juror could have found the following from the evidence presented at trial.

D'Amato, an attorney, started a law partnership with Jeffrey Forchelli in 1976. By 1988, the two were practicing as partners of D'Amato, Forchelli, Libert, Schwartz, Mineo & Carlino ("D'Amato Forchelli"), a firm of

---

[*] The Honorable Milton Pollack, United States District Judge for the Southern District of New York, sitting by designation.

1. Unisys was formed in 1986 by the merger of Sperry Corporation and Burroughs Corporation. All references to Unisys actions prior to 1986 pertain to Sperry Corp. For convenience, all references to Sperry and Unisys are simply to Unisys.

roughly twenty lawyers based in Mineola, New York. D'Amato's brother, Alfonse D'Amato, was a United States Senator from the State of New York throughout the period of relevant events. Senator D'Amato was a member of the Senate Appropriations Committee, the Senate committee charged with oversight of defense procurement programs.

Unisys, a Fortune 100 company, maintained a Surveillance and Fire Control Systems Division ("S & FCS") in Great Neck, New York. This division manufactured radar missile control systems that were sold to the United States government. Charles Gardner served as a Unisys vice president in charge of marketing for S & FCS from the early 1980's until March 1988. Throughout the pertinent period, Gardner bribed Navy officials, made illegal campaign contributions to Congressmen, and personally profited through kickbacks. The government has stipulated, however, that none of these illegal activities involved D'Amato or Senator D'Amato, and there was no evidence that D'Amato was aware of any of Gardner's illegal activities.

Gardner first met D'Amato in spring 1984. At the time, Gardner was seeking to obtain support for the purchase of Unisys products in the Senate Appropriations Committee. Over the course of two meetings, Gardner expressed his interest in gaining Senator D'Amato's support and told Armand D'Amato that he was being hired to further that purpose. Gardner told D'Amato that he would be paid by means of a purchase order, and that these purchase orders would generally call for the production of some form of reports on Congressional proceedings. D'Amato apparently agreed to represent Unisys, although the work was to be done by Peter Iovino, who was joining D'Amato Forchelli to open a Washington, D.C. office.

In 1985, Gardner, dissatisfied with Iovino, sent Herbert Chodosh, a Unisys marketing manager, to ask D'Amato to work for Unisys personally. D'Amato agreed, and the parties discussed another purchase order arrangement, this time through Coastal Energy Enterprises ("Coastal"), a Unisys subsidiary. In a subsequent meeting with D'Amato, Gardner made clear that Unisys was hiring D'Amato to "support[ ] our programs in the Senate Appropriations Committee through [ ]

Senator D'Amato's office." Gardner told D'Amato that he would receive $5,000 per month for his services and would be paid through Coastal's issuance of a purchase order calling for the production of reports on Congressional proceedings. Gardner further indicated to D'Amato that Unisys "would offer to help to do the report."

Pursuant to this agreement, in April 1986 Coastal sent D'Amato a purchase order to cover the period from June 1, 1986 to May 31, 1987. The purchase order called for D'Amato Forchelli to "[p]rovide technical services to advise Coastal on matters as specified in the attached Statement of Work." The statement of work contained directives such as "[a]nalyze matters within the purview of Coastal Energy Enterprises in such areas as Federal budgeting, legislative action, likelihood of program funding" and "[p]rovide reports to Coastal relative to performance of competitive companies' offerings of products."

Pursuant to the purchase order, D'Amato Forchelli sent monthly bills on its letterhead to Coastal seeking payment "For Professional Services Rendered: Re: Coastal Energy Enterprises, Inc. Monthly Retainer." By December 1986, Coastal had raised D'Amato Forchelli's retainer to $6,500 a month, and in May 1987 the agreement was extended for another year. In or around July 1986 and December 1987, Unisys employees asked D'Amato to transmit to Senator D'Amato's office draft letters to the Secretary of the Navy composed by Unisys employees. D'Amato apparently complied on both occasions, and letters bearing Senator D'Amato's signature were in fact sent to the Secretary of the Navy.

In fall 1987, Unisys began an internal investigation of alleged unethical behavior by Unisys employees. The investigation was headed by Lawrence Cresce, the Unisys ombudsman, who in turn reported to Henry Ruth, counsel to Unisys's corporate ethics committee. Cresce received information that Gardner was involved in unethical lobbying activities and began an investigation. Cresce's investigation discovered that Gardner had entered into numerous technical service agreements on behalf of Unisys that

called for the production of reports. Upon examining the reports, Cresce became suspicious that many of the reports had been plagiarized from public sources.

In November 1987, Cresce questioned Gardner about his activities. Gardner acknowledged that the reports mentioned in the purchase orders "just weren't worth the money," and that the "reports were window dressing, and simply paper so that the consultants can get paid." Gardner further maintained that the consultants he hired were performing valuable work for Unisys. Gardner, however, did not tell Cresce that he had bribed Navy officials. Gardner also falsely denied receiving kickbacks.

In early 1988, Gardner met with senior management and explained the benefits to Unisys of the technical service agreements. Cresce also informed senior Unisys officials, including the Chairman of the Board and the General Counsel, of Gardner's procedure for paying political consultants. Subsequent to his November 1987 meeting with Gardner, Cresce received information that Gardner had used D'Amato Forchelli as a "contact point" with Senator D'Amato's office. Cresce eventually prepared a report dated May 1988 that concluded that Gardner had, among other activities, used D'Amato Forchelli to gain access to Senator D'Amato.

Meanwhile, Gardner had closed Coastal in 1987. Coastal's last payment to D'Amato Forchelli came in November 1987, bringing the total of payments to D'Amato Forchelli by Coastal to $88,000. Gardner decided, however, to continue to retain D'Amato's services through Unisys. Unisys internal procedures dictated that purchase orders to law firms had to be released and controlled by Unisys's law department. Gardner and Dennis Mitchell, a Unisys marketing manager, conceived the idea of circumventing this requirement by issuing the purchase order in the name of Jeffrey Forchelli, the second name on the firm's letterhead. At a subsequent meeting attended by Norm Steiger, head of the Unisys legal department at its Great Neck facility, it was mutually agreed that purchase orders would be issued in the name of Forchelli. Gardner further testified that the decision to use Forchelli's name rather than D'Amato's was "made because it was considered to be in the interest of Uni-

sys company[ ] not to have the D'Amato name out there, because it ... could be politically embarrassing." At Gardner's direction, Mitchell called the D'Amato Forchelli firm and confirmed that the law firm would accept a check made out to Forchelli alone.

Gardner also spoke to D'Amato about the payment of D'Amato Forchelli's outstanding bills. Gardner told D'Amato that he would be issuing a purchase order directly from Unisys, and that the purchase order, like the ones before, would "use the reports as a means to the end. And we would be supplying reports or helping him do the reports."

Thereafter, in February 1988, Mitchell issued a purchase order from Unisys in the name "J. Forchelli" at D'Amato Forchelli's address. The purchase order, dated February 2, 1988, covered the period of November and December 1987, in order to compensate D'Amato for two months he was not paid due to the closing of Coastal. The purchase order provided for payment of $13,000, per the prior agreement of $6,500 per month. The purchase order required the seller to "[p]rovide technical services to produce two survey reports evaluating the proceedings of the U.S. Senate" in accordance with an attached statement of work. The statement of work read as follows:

> Provide technical services to produce two reports on senatorial proceedings. Each report is to provide a quantitative and qualitative statement of senatorial action during the period for each program of concern to Unisys. Also provide an assessment of ultimate senatorial direction and any outside or competitive actions that may adversely influence the outcome of these programs.

The purchase order also provided, "Reports and invoices to be approved by C.F. Gardner Prior to payment." Mitchell testified that he did not understand the purchase order to require that D'Amato produce the reports.

The purchase order was mailed to Forchelli in February 1988. Forchelli and the firm's bookkeeper, Marlene Schwartz, met briefly with D'Amato in Schwartz's office. Forchelli asked D'Amato if he had "done the work." After looking at the purchase order, D'Amato responded affirmatively and mentioned travelling to Washington, D.C. for "work." For-

chelli then signed the order. The government presented no evidence that the counter-signed order was returned to Unisys.[2]

On March 7, 1988, D'Amato Forchelli sent another bill to Unisys on the firm's letterhead. The bill, which again requested payment "For Professional Services Rendered: Re: Monthly Retainer," showed a previous balance of $26,000 and a March 1988 balance of $6,500, for a total due of $32,500.

On March 15, 1988, Unisys issued a "Purchase Order Change" form to Forchelli. The form changed the dates of the most-recently issued purchase order to run from November 1, 1987 to March 31, 1988, and provided for payment of $32,500. The description of work stated, "Provide technical services to produce five survey reports as per orig. P.O." As with the prior purchase order, there was no evidence that Forchelli ever returned the purchase order to Unisys.

In April 1988, Unisys sent D'Amato Forchelli a discrepant invoice form indicating that Unisys could not make payment on the invoice received from D'Amato Forchelli because the name of the firm on the invoice diverged from the name on the purchase order Unisys had issued (i.e., Forchelli's name alone). Mitchell, after discussing the problem with Gardner, called Forchelli's secretary and asked that the invoice be resubmitted on letterhead with Forchelli's name alone. D'Amato also asked Forchelli to submit a bill in Forchelli's name, because "that's what the client wanted." Forchelli thereafter met with Schwartz and instructed her to generate letterhead with Forchelli's name alone and to prepare three new bills on this letterhead. The three new bills all called for payment "For Professional Services Rendered: Re: Monthly Retainer." The bills cumulatively covered six months of services (January 1988 to June 1988) and called for payment of $39,000. Unisys subsequently sent checks of $13,000 and $19,500 in April and June 1988 respectively in partial payment of the bills submitted.

Throughout D'Amato's relationship with Unisys, he never supplied Unisys with any written reports. Gardner testified, however, that he told D'Amato that D'Amato would not be responsible for the preparation of the reports. In fact, Unisys employees prepared five brief (less than half-a-page) reports and attached them to Forchelli's bills.

In connection with the sentencing, the district court found that D'Amato spent approximately 100 hours performing lobbying services for Unisys. The court further found that D'Amato travelled three times to Washington, D.C., at least in part on behalf of Unisys. In addition, D'Amato met with Unisys employee Lynch around ten times in his office, where Lynch briefed D'Amato on Unisys's programs and needs. D'Amato also helped cause two letters by Senator D'Amato and one by Congressman Norman Lent to be sent to Navy and Commerce Department officials concerning defense contracts.

Gardner resigned from Unisys in March 1988. He was immediately rehired by Unisys, however, as a consultant, later to resign. The final payment to Forchelli was made after Gardner had resigned, the last check being issued on June 3, 1988.

A grand jury returned an indictment charging D'Amato with twenty-four counts of mail fraud. In particular, the indictment charged that twenty-four separate mailings constituted mail fraud under two separate legal theories. First, the indictment charged that the mailings were used as part of a scheme and artifice to "defraud Sperry/Unisys and its uninvolved officers, directors and shareholders, of the right to control the expenditure of corporate funds and to decide the manner and purpose of those expenditures" (the "right to control theory"). Second, the indictment charged that the mailings were part of a scheme to "obtain money and property from Sperry/Unisys, by means of false and fraudulent pretenses, representations and promises" (the "false pretenses theory"). Counts 1–17 of the indictment pertained to invoices D'Amato sent Coastal and checks he received from Coastal. Counts 18–24 pertained to invoices sent to Unisys and the two checks D'Amato received from Unisys totalling $32,500.

---

2. While D'Amato at the time believed that it was "important" for D'Amato Forchelli to return a signed purchase order in order to be paid by Unisys, this belief turned out to be mistaken. In fact, this was the only counter-signed purchase order introduced at trial, and it was found in D'Amato Forchelli's files.

Prior to trial, D'Amato moved, *inter alia,* to dismiss the indictment principally on the grounds that it failed to allege the deprivation of a property right necessary for a mail fraud prosecution. The district court denied D'Amato's motion, holding that "the fraud for which the defendant has been indicted involves the same property interest recognized in [*United States v. Wallach,* 935 F.2d 445 (2d Cir.1991) ]."

The case was tried to a jury before Judge Mishler from April 19 to May 7, 1993. D'Amato was acquitted of the charges stemming from his work on behalf of Coastal (Counts 1–17), but convicted of the charges relating to his representation of Unisys (Counts 18–24). Subsequent to the verdict, D'Amato moved for a judgment of acquittal pursuant to Fed.R.Crim.P. 29(c), or, in the alternative, for a new trial under Fed. R.Crim.P. 33. The district court denied D'Amato's motion.

On November 5, 1993, the district court sentenced D'Amato. After commenting that "[m]aybe one out of 100 [lawyers] would say no" to a retainer offered on the condition that the bills not disclose that lobbying was the purpose of the agreement, the district court sentenced D'Amato to five months imprisonment, five months home detention, and two years of supervised release. D'Amato was also ordered to pay $7,500 in restitution to Unisys, and a special assessment of $350. This appeal followed.

### DISCUSSION

D'Amato raises a number of arguments on appeal. Because we agree that the government failed to produce legally sufficient evidence of D'Amato's criminal intent, we address only his sufficiency argument.

■ D'Amato of course bears a "heavy burden" in challenging his conviction on the ground of insufficiency of the evidence. *United States v. Casamento,* 887 F.2d 1141, 1156 (2d Cir.1989), *cert. denied,* 493 U.S. 1081, 110 S.Ct. 1138, 107 L.Ed.2d 1043

(1990). Not only must the evidence be viewed in the light most favorable to the government and all permissible inferences drawn in its favor, *Nersesian,* 824 F.2d at 1302, but should the evidence, thus construed, suffice to convince any rational trier of fact that the crime charged has been proven beyond a reasonable doubt, then the conviction must stand. *United States v. Resto,* 824 F.2d 210, 212 (2d Cir.1987) (citing *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). Moreover, "pieces of evidence must be viewed not in isolation but in conjunction," *United States v. Brown,* 776 F.2d 397, 403 (2d Cir.1985), *cert. denied,* 475 U.S. 1141, 106 S.Ct. 1793, 90 L.Ed.2d 339 (1986), and the jury's verdict may be based on circumstantial evidence. *United States v. Libera,* 989 F.2d 596, 601 (2d Cir.), *cert. denied,* — U.S. —, 114 S.Ct. 467, 126 L.Ed.2d 419 (1993); *Casamento,* 887 F.2d at 1156 ("It is the role of a jury to draw reasonable inferences or conclusions from facts which the jury determines the evidence establishes.").

■ Nonetheless, a conviction based on speculation and surmise alone cannot stand. *United States v. Wiley,* 846 F.2d 150, 155 (2d Cir.1988). In particular, the government must introduce sufficient evidence to allow the jury to reasonably infer that each essential element of the crime charged has been proven beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Macklin,* 671 F.2d 60, 65 (2d Cir.1982). Therefore, the government must do more than introduce evidence "at least as consistent with innocence as with guilt." *United States v. Mulheren,* 938 F.2d 364, 372 (2d Cir.1991) (quoting *United States v. Mankani,* 738 F.2d 538, 547 (2d Cir.1984)).

■ The mail fraud statute criminalizes use of the mails in furtherance of a "scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses...." 18 U.S.C. § 1341.[3] Therefore, an essential element of any mail fraud

---

**3.** Section 1341 provides in full:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or prom-

ises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or inti-

prosecution is proof of a "scheme or artifice to defraud." *Id.; see also United States v. Starr*, 816 F.2d 94, 98 (2d Cir.1987). Essential to a scheme to defraud is fraudulent intent. *Durland v. United States*, 161 U.S. 306, 313–14, 16 S.Ct. 508, 511, 40 L.Ed. 709 (1896) ("The significant fact is the intent and purpose."); *Starr*, 816 F.2d at 98 (fraudulent intent "critical" to a scheme to defraud); *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1180 (2d Cir.1970) (same).

■ The scheme to defraud need not have been successful or complete. *Durland*, 161 U.S. at 315, 16 S.Ct. at 512; *Starr*, 816 F.2d at 98. Therefore, the victims of the scheme need not have been injured. *United States v. Andreadis*, 366 F.2d 423, 431–32 (2d Cir. 1966), *cert. denied*, 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967). However, the government must show "that some actual harm or injury was *contemplated* by the schemer." *Regent Office Supply Co.*, 421 F.2d at 1180; *see also United States v. Mittelstaedt*, 31 F.3d 1208, 1216 (2d Cir.1994); *Starr*, 816 F.2d at 98; *United States v. London*, 753 F.2d 202, 206 (2d Cir.1985).

■ Because the defendant must intend to harm the fraud's victims, "[m]isrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution." *Starr*, 816 F.2d at 98. "Instead, the deceit must be coupled with a contemplated harm to the victim." *Id.* In many cases, this requirement poses no additional obstacle for the government. When the "necessary result" of the actor's scheme is to injure others, fraudulent intent may be inferred from the scheme itself. *Regent Office Supply Co.*, 421 F.2d at 1181 (quoting *Horman v. United States*, 116 F. 350, 352 (6th Cir.), *cert. denied*, 187 U.S. 641, 23 S.Ct. 841, 47 L.Ed. 345 (1902)). Where the scheme does not cause injury to the alleged victim as its necessary result, the government must produce evidence independent of the alleged scheme to show the defendant's fraudulent intent. *See, e.g., Starr*, 816 F.2d at 98–99.

### 1. The Right to Control Theory

#### a) The Elements.

■ We first address the right to control theory. That "theory is predicated on a showing that some person or entity has been deprived of potentially valuable economic information." *Wallach*, 935 F.2d at 462–63. Thus, "the withholding or inaccurate reporting of information that could impact on economic decisions can provide the basis for a mail fraud prosecution."[4] *Id.* A person charged with mail fraud under the right to control theory must intend to injure the person or entity misled—here Unisys, its management, and/or its shareholders—and the person or entity must thus be a specific target of the inaccurate or concealed information. Mail fraud cannot be charged against a corporate agent who in good faith believes that his or her (otherwise legal) misleading or inaccurate conduct is in the corporation's best interests.[5]

---

mated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

18 U.S.C. § 1341.

**4.** We assume, without deciding, that the disguising of D'Amato's services was material under the *Wallach* test.

**5.** We do not understand the government to disagree with this proposition. Indeed, at oral argument, the panel asked government counsel whether the "right to control" theory would criminalize routine and necessary business billing practices in which an agent of a corporation is asked, out of a concern for a corporation's best interests, to submit an incomplete or misleading billing. Specifically, the panel used the examples of an oil company that has hired an independent geologist to drill for oil in a certain region, but does not want its efforts known, and a corporation that has hired a forensic accounting firm to investigate alleged embezzlement. In response, the government maintained that an agent following such instructions "might [commit] mail fraud ... [depending on whether] there's [an] intent to harm the corporation."

■ Where no rule otherwise provides, persons acting on behalf of a corporation may well find it necessary to disguise or conceal certain matters in the interests of that corporation. For example, failure to disclose the nature of a service provided or the identity of the entity performing such a service may minimize the risk of disclosure of information that would enable competitors to learn of a corporation's future activities or plans. Mining companies may thus conceal the hiring of geologists and the site of their work. Such measures may be necessary also to protect company assets. A company may thus disguise the hiring of forensic accountants in order to avoid giving warning to an undetected embezzler. The preservation of a positive public relations image is a proper corporate goal and may be pursued by a policy of concealment. Such a policy may be necessary also to prevent insider trading. Firms planning a takeover may thus wish to conceal relationships with law firms, accountants, or banks until required to disclose under the Williams Act. 15 U.S.C. §§ 78m(d), (e) & 78n(d)–(f) (1988).

■ The critical elements are: (i) whether corporate management has made an otherwise lawful decision, *see Miller v. American Tel. & Tel. Co.*, 507 F.2d 759, 762 (3d Cir.1974) (illegal acts may amount to a breach of fiduciary duty), that concealment or a failure to disclose is in the corporation's best interests and (ii) whether management acted in good faith in making, and did not personally profit from, the decision. *See Wallach*, 935 F.2d at 464. As we noted in *Wallach*, the principle that directors and officers may act on behalf of a corporation does not extend to acts of self-enrichment. However, a good faith, unconflicted decision may not be second-guessed by the government or by the courts. *See Miller*, 507 F.2d at 762 ("The sound business judgment rule ... expresses the unanimous decision of American courts to eschew intervention in corporate decision-making if the judgment of directors and officers i[s] uninfluenced by personal considerations and is exercised in good faith.").

■ In the instant matter, of course, the defendant is not someone in corporate management but a person hired to perform services for the corporation. Such a person cannot be found to intend to harm a corporation or its shareholders through otherwise lawful misleading conduct if he or she follows the instructions of an appropriate corporate agent who appears to be unconflicted and acting in good faith. So far as the duty of a party contracting to provide ordinary business or professional services to the corporation is concerned, therefore, that party may rely upon instructions from a corporate agent with apparent authority and no ostensible conflict of interest to determine the contracting party's obligations and appropriate billing practices.

■ Additional considerations apply to a claim that shareholders have been deprived of their right to control. Unlike management, shareholders have no right to manage the business. *Wallach*, 935 F.2d at 462. Nevertheless, they do have property rights of which they may not be fraudulently deprived by "the withholding or inaccurate reporting of information that could impact on economic decisions." *Id.* at 463.

■ These property rights are defined by (i) state law concerning access to the company's books and records and the fiduciary obligations of management and (ii) the law of fraud concerning corporate information that is public. An inaccurate statement in documents that are not lawfully available for inspection by shareholders, and do not materially affect information that is available, can hardly be said, without more, to defraud, or to be intended to defraud, such shareholders. *Cf. Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1105–08, 111 S.Ct. 2749, 2764–66, 115 L.Ed.2d 929 (1991) (causation element of fraud not met where minority shareholders' reliance on misleading information had no effect on the rights of such shareholders and had no significance in influencing the actions of the corporation). Moreover, good-faith, unconflicted business decisions of management are protected from shareholder challenge by the business judgment rule. *See Miller*, 507 F.2d at 762. A policy of concealment that is protected by the business judgment rule, therefore, does not deprive shareholders of anything useful, and those responsible for the inaccuracy cannot have intended to defraud shareholders. Of

course, the concealment of some information may be intended to further a breach of a state law fiduciary obligation to shareholders, including a fiduciary obligation not to commit illegal acts. *See id.* Where the inaccuracy is intended to conceal such a breach, both a deprivation and fraudulent intent may exist.

■ The otherwise lawful "withholding or inaccurate reporting of information" must thus relate to: (i) information available to shareholders as provided by the state of incorporation's laws providing access to corporate books and records, *see Wallach,* 935 F.2d at 463 (maintenance of accurate books and records is of "central importance" to preservation of shareholders' property interest); (ii) information that, if withheld or inaccurate, would result in rendering information that is public materially misleading, *see id.* (right to public information, required to be disclosed by law, is important component of shareholders' property rights), and (iii) information that would materially aid shareholders in enforcing management's fiduciary obligations under state law, *see id.* ("complete information" enables a stockholder to take "steps" to prevent corporate actions of which he or she disapproves). Where a third party acting upon instructions from a corporate agent is charged with depriving shareholders of their right to control, the government must prove that the third party knew that the concealment would involve (i), (ii), or (iii).

### b) Sufficiency of the Evidence.

■ The government's claim that D'Amato intended to injure Unisys by depriving its management or its shareholders of their right to control was not based on legally sufficient evidence. The jury could have found that D'Amato knew that his services on behalf of Unisys were disguised. However, the government concedes that the payments to D'Amato for the purpose of gaining "access" to his brother were not illegal. From D'Amato's point of view, if such access

resulted in political support from the Senator that helped Unisys's sales, Unisys and its shareholders would benefit. Also from D'Amato's point of view, it was evident that Unisys might desire to keep its source of access to the Senator confidential because the means of access could easily become controversial and self-defeating if disclosed. D'Amato thus could have intended to deprive Unisys management (or shareholders) of "valuable" information that "could impact" on economic decisions only if (i) Gardner had no authority to instruct D'Amato to disguise his services in billing Unisys and D'Amato knew it, (ii) the payments to D'Amato were otherwise unlawful and D'Amato knew it, or (iii) Gardner was personally profiting from the concealed arrangement with D'Amato and D'Amato knew it. None of these conditions has been met in the instant matter.

The government does not claim that the payments were otherwise unlawful. Nor does it claim that Gardner received kickbacks from D'Amato or otherwise profited from the concealed arrangement. Conditions (ii) and (iii) are thus not at issue. With regard to (i), there is no evidence that D'Amato complied with Unisys's request to disguise his services through Forchelli in order to further a scheme to injure Unisys rather than because he thought it was a reasonable request by his client. Gardner testified that he met with Unisys in-house lawyers and that they agreed that D'Amato should bill through Forchelli because it was "in the interest of Unisys" and otherwise could be "politically embarrassing." [6] Likewise, D'Amato testified that he and Forchelli determined that Unisys must have decided to suppress D'Amato's name to avoid negative publicity. They thought this especially likely because Unisys was a Long Island company and Senator D'Amato was at the time receiving critical attention from the Long Island-based newspaper, *Newsday.* The govern-

---

**6.** The government's argument that fraudulent intent can be inferred because of "D'Amato's suggestion that bills should be sent to Unisys on stationery with Forchelli's name alone" is both factually and legally flawed. As a factual matter, the government introduced no evidence that D'Amato suggested this arrangement. The evidence was uncontradicted that Mitchell and Gardner, both Unisys employees, decided that D'Amato Forchelli should submit an invoice on letterhead with Forchelli's name alone, and that Mitchell contacted a secretary at D'Amato Forchelli to request this arrangement. As a legal matter, moreover, even if D'Amato had suggested the arrangement, it would not be evidence of an intent to injure Unisys so long as the suggestion aided Gardner's expressed goal of concealment and Gardner adopted it in aid of that goal.

ment thus offered no reason why anyone in D'Amato's position would think that he or she was injuring Unisys by complying with the request to use the Forchelli invoice. *See Mulheren,* 938 F.2d at 372 (fraudulent intent cannot be inferred from evidence "at least as consistent with innocence as with guilt").

The government seems to argue that D'Amato's reliance on Gardner's instructions is unavailing because Gardner and his "cohorts" were "rogue employees." Rhetoric aside, however, there was no evidence that D'Amato knew, should have known, or could have known, that these employees had no authority to pay him to obtain access to his brother, even if that were true.[7] Gardner testified that he never told D'Amato of his payment of bribes or receipt of kickbacks in dealing with others. No Unisys employee or anyone else testified that D'Amato knew, or had reason to know, of such actions. Absent any indication of wrongdoing, D'Amato was warranted in relying on the apparent authority of these Unisys employees. Restatement (Second) of Agency §§ 8, 161. In fact, Unisys continued to pay D'Amato after Cresce's report had exposed Gardner's wrongdoing and after Gardner had been forced to resign, albeit to remain on as a consultant. (We were informed at oral argument that although Unisys was aware of Gardner's misdeeds, it continued to use his services and severed all connections with him only after "search warrants were executed.").

With regard to the shareholders' right to control, similar considerations apply. D'Amato had no reason to believe that Gardner's apparent authority to act did not bind the shareholders. Moreover, the government failed to show that Unisys shareholders were deprived of "valuable economic information" that "could impact" on any decision that was theirs to make. The government thus failed to show that shareholders had a right to such information under applicable Delaware law. *Cf. Skouras v. Admiralty Enters., Inc.,* 386 A.2d 674, 678 (Del.Ch.1978) (shareholder may

gain access to books and records only if he or she meets burden of proving a proper purpose for the inspection). It even failed to introduce Unisys's pertinent books of account, and we are thus unaware of what a shareholder would have found if a right to examine them existed. No claim is made that D'Amato's conduct affected any filing with the Securities and Exchange Commission or other public information concerning Unisys's finances. Nor can it be argued that the disguising of the payments deprived shareholders of a right to seek injunctive redress against the payments to D'Amato as a breach of a state law fiduciary obligation because the government concedes the payments were legal and neither Gardner nor any other Unisys employee profited from them.

Our conclusion is in no way inconsistent with *United States v. Wallach,* 935 F.2d at 445. In *Wallach,* false bills were submitted in order to perpetuate, in conjunction with Wedtech officers, securities fraud on Wedtech shareholders. Two of the defendants, London and Chinn, submitted false invoices in order to disguise the fact that they had been paid for assisting in a stock parking scheme. *Id.* at 453. The third defendant, Wallach, performed lobbying services for Wedtech yet submitted bills that attributed his services to assistance with a public offering and various capital acquisitions. *See id.* at 451–52. Wallach's misstatements enabled Wedtech to capitalize the cost of his services rather than to expense them in the current accounting period. *Id.* at 451. This artificially inflated Wedtech's current earnings and caused misleading reports, which were available to shareholders, to be filed with the Securities and Exchange Commission. *Id.* at 452. There was evidence, moreover, that

---

7. Although we do not rely upon the claim of error raised—whether Unisys has waived the attorney-client privilege concerning its management's knowledge of Gardner's activities—the conclusion that Gardner was a "rogue" and not authorized by senior Unisys management is based on a flawed record. Unisys was allowed to invoke the attorney-client privilege to block

defense inquiries at trial into communications concerning management's knowledge of Gardner's activities notwithstanding the government's introduction in its main case of similarly privileged material provided to it by Unisys. *See In re Steinhardt Partners,* 9 F.3d 230, 235 (2d Cir. 1993) (provision of privileged materials to government agency waives privilege).

Wallach was aware of, and was to share in, the diversion of Wedtech funds to London and Chinn. *Id.* at 453. He was thus not an innocent provider of services to Wedtech unaware of the effect of his actions.

## 2. *The False Pretenses Theory*

 The false pretenses theory, simply stated, is a claim that D'Amato represented to Unisys that he would prepare reports in exchange for the fees he received, and took the money but prepared no reports. The government's false pretenses theory thus rests on the allegation that D'Amato did not perform the services that he contracted to perform for Unisys and for which he was paid.

 D'Amato admits that he never intended to produce any reports in exchange for the fees he received.[8] Criminal intent was not proven, however. As noted, there was no evidence that D'Amato ever believed, or even had reason to believe, that Gardner and others lacked authority to represent and bind Unisys in their dealings with D'Amato, and the record unambiguously demonstrates that Gardner told D'Amato that he did not have to prepare reports. Gardner testified that his understanding had been that Unisys employees would supply the reports. Indeed, the government in its argument stresses that Gardner, Chodosh, and other Unisys employees repeatedly told D'Amato that the reports would be written by Unisys staffers. Moreover, Dennis Mitchell, the Unisys official who issued the relevant purchase order, testified that he did not understand the pur-

chase order to require D'Amato to produce the reports.[9]

D'Amato could hardly have believed that he was supposed to provide written reports. From the beginning of the relationship, all the purchase orders contained roughly the same description of work. D'Amato had consistently been paid without comment by Unisys concerning his failure to submit reports. Given this consistent course of dealing, D'Amato had no reason whatsoever to believe that the most recent purchase order required him to submit a written report. *See IBJ Schroder Bank & Trust Co. v. Resolution Trust Corp.*, 26 F.3d 370, 374 (2d Cir. 1994) ("For over a century, courts have looked to the conduct of the parties in resolving ambiguities in contractual language."); *see also* John D. Calamari, Joseph M. Perillo, *Contracts*, § 3–17, at 178–81 (3d ed. 1987). There is thus no dispute that D'Amato performed all the services for Unisys that were requested of him. The government's theory was and is that D'Amato was paid for lobbying his Senator brother, concededly lawful conduct. There is no evidence that he did not perform such services. It is inconceivable on this record that Unisys could survive a motion for summary judgment in a civil suit to recover fees from D'Amato based on a false pretenses theory, even under the lower burden of proof applicable to civil cases.

 Finally, the government argues that D'Amato's services were not worth what Unisys paid for them. This argument is seriously misguided. The mail fraud statute does not criminalize the charging of an allegedly excessive fee, where, as here, a corporate agent with at least apparent authority to do

---

**8.** A breach of contract does not amount to mail fraud. Failure to comply with a contractual obligation is only fraudulent when the promisor never intended to honor the contract. *See United States v. Paccione*, 949 F.2d 1183, 1196 (2d Cir. 1991) ("scheme to offer services in exchange for a fee, with the intent not to perform those services, is within the reach of § 1341"); *Soper v. Simmons Int'l, Ltd.*, 632 F.Supp. 244, 249 (S.D.N.Y.1986). To infer fraudulent intent from mere nonperformance, therefore, would eviscerate the distinction between a breach of contract and fraud. *See Soper*, 632 F.Supp. at 249 ("proof of [fraudulent] intention must be based on more than a mere showing of nonperformance").

**9.** The purchase order is not unambiguous. It does not expressly require D'Amato to submit written reports to Unisys. Instead, it provides that D'Amato shall "[p]rovide technical services to produce two survey reports." The language of the provision strongly implies that someone other than D'Amato will produce the reports, as D'Amato was told by all the Unisys employees with whom he had contact. In fact, the government's contrary reading of the purchase order renders the phrase "provide technical services to" superfluous. Moreover, D'Amato repeatedly submitted bills to Unisys that sought payment only "For Professional Services Rendered: Re: Monthly Retainer."

so agreed to the fee, received no personal benefit from the fee, and was not deceived by the payee. Retainer agreements that keep providers of services available are commonplace, and sometimes those services are not needed. We decline the government's invitation to infer fraudulent intent on the part of an attorney who accepts a retainer arrangement and is subsequently not called upon to perform services that the government or trier of fact deems worth the fee paid. Moreover, the government offered no evidence that access to the Senator was not worth the fees paid.

We vacate the conviction, and order dismissal of the indictment.