**UNITED STATES, Appellee,**

v.

**Jerome E. ROSEN, Defendant, Appellant.**

No. 97–1209.

United States Court of Appeals,
First Circuit.

Heard Sept. 9, 1997.

Decided Nov. 12, 1997.

Morris M. Goldings, with whom Richard S. Jacobs and Mahoney, Hawkes & Goldings, Boston, MA, were on brief for appellant.

Mark J. Balthazard, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, Boston, MA, was on brief for appellee.

Before TORRUELLA, Chief Judge, ALDRICH, Senior Circuit Judge, and LYNCH, Circuit Judge.

TORRUELLA, Circuit Judge.

Attorney Jerome Rosen appeals his conviction on four counts of federal mail fraud stemming from certain representations Rosen made to the trustee of a debtor in bankruptcy. He was sentenced to two years probation, including eight months home confinement, and fined $30,000. Rosen argues that the elements of mail fraud were not met by his failure to disclose certain information about a proposed asset sale, and that there was insufficient evidence to convict. We affirm.

## BACKGROUND

On an appeal from a jury conviction, we must view the evidence in the light most favorable to the jury's verdict, *see United States v. Gonzalez–Maldonado,* 115 F.3d 9, 12 (1st Cir.1997), unless presented with a claim that suggests that the jury's balanced assessment of the evidence was itself somehow tainted, *see United States v. Roberts,* 119 F.3d 1006, 1008 (1st Cir.1997) (no need to view record in light most favorable to government in context of prosecutorial misconduct claim). On this appeal, we are limited to the evidence and inferences most favorable to the verdict, and on this basis the following facts could have been found by the jury.

Rosen served as legal counsel to the owners and operators of New England Tri–State Development Corporation ("Tri–State"). Tri–State, which was owned and operated by George and Kevin Kattar, operated a golf course in Massachusetts and held an approximately 1,100 acre parcel of undeveloped land in Maine. In April 1992, Tri–State filed a voluntary Chapter 11 bankruptcy petition.

At some point in the winter of 1993–94, Kevin Kattar told Rosen that a Maine lumberman named Michael Griffen was potentially interested in purchasing the Maine property for a total of approximately $1 million, to be paid in installments. Griffen was in contact with another Maine lumberman, Orland Dwelley, who also had some interest in purchasing and developing the Maine property. In March 1994, the Tri–State case was converted to a Chapter 7 liquidation, and Joseph Braunstein was appointed as trustee. During the Chapter 7 conversion hearing, Rosen, appearing as the debtor Tri–State's attorney, stated that Tri–State had received an offer of $500,000 for the Maine property,

and also stated that Tri–State believed the property to be worth $750,000.

After the conversion, and no later than May 1994, Rosen began negotiating a possible sale price with Griffen. Although Kevin Kattar sought a $1 million sale price during a meeting with Griffen and Rosen on May 25, 1994, no concrete terms were assented to. In a letter of May 16, 1994, Rosen indicated to the trustee that Rosen was attempting to find a buyer for the Maine property at a price of "$500,000 cash." In a letter to Griffen dated June 6, 1994, Rosen stated that, based on the May 25, 1994 meeting with Griffen in Boston, it was Rosen's understanding that Griffen wished to "buy the above property ... at a total cost to you which will not exceed $1,000,000.00, including legal and consulting fees, payable no more than $525,-000.00 upon delivery of good, clear, and marketable title ... and any balance over up to four years." The June 6, 1994 letter to Griffen also suggested two approaches to selling the Maine property, one of which was the following:

> 2. Having you make an offer to purchase directly to the trustee for $500,000 cash and then hiring Kevin and George Kattar to help you develop the property at a salary of $60,000.00 per year each on a four year employment contract.[1]

Griffen did not sign or return Rosen's letter.

Soon, it became clear that Orland Dwelley, and not Griffen, would be the most likely purchaser and developer of the Maine property. Rosen telephoned Dwelley to discuss a sale at a net price of $1 million, with $500,000 to be paid up front. On July 12, 1994, Rosen sent a letter to Dwelley stating that the offer price was for $500,000, and adding the following:

> In addition, our understanding is that you, with Mr. Griffin, will engage the Kattar boys as your consultants for a total amount of $475,000, payable over four years in monthly payments totalling $9896.00 (each of the two Kattars to receive one-half, or $4948.00 per month). Lastly, you will pay me a fee of $25,000.00 if you are successful

at acquiring the property, but not otherwise, payable at closing.

Dwelley signed and returned an attached letter dated July 14, 1994, which Rosen had prepared, stating in pertinent part:

> we (together with our associates) are prepared to pay the sum of $1,000,000 for the Property in approximately the following manner: $500,000 upon delivery of a Deed conveying good record and marketable title, ... and the balance (less our expenses for your services) over a period of years (not to exceed five) either by way of a secured note or consulting fees, secured by a lien on the property.

> For your services as aforesaid, we will pay you the sum of $25,000, plus actual expenses, at Closing.

Rosen also drafted an offer letter from Dwelley to the trustee, which stated a $500,-000 offer price but did not mention any further payments to be made to either the Kattars or Rosen. The offer letter, which was signed by Dwelley and forwarded by Rosen to the trustee on July 18, 1994, stated that "we would expect to seek to employ one or more of the former officers of Tri–State to assist us in marketing the property," but did not provide any further details.

Rosen never disclosed to the trustee the substance of the employment relationship discussed in his correspondence with Dwelley. Rosen did not provide the trustee with a copy of the July 14, 1994 letter that Dwelley signed. When the trustee questioned Rosen on July 25, 1994 about the reference in Dwelley's offer letter to the possible employment of "one or more of the former officers" of Tri–State, Rosen told the trustee that there "was nothing definite as far as what the compensation [would be] or even if they would be employed."

In a letter to Dwelley dated August 2, 1994, Rosen wrote:

> I forgot to mention in our telephone conversation that if you get a call from the Trustee, whose name is Joseph Braunstein, or his associate ... I would prefer that

---

1. The other approach discussed in the letter was reaching an understanding with the holders of the mortgage on the Maine properties to buy the

property from the Trustee and then sell it to Griffen.

you not give either of them the salary details about your agreement to hire the Kattar boys if the sale goes through.

Rosen used another attorney, John Rodman, as the attorney of record for Dwelley. When Rodman asked Rosen if there had been any specific employment arrangements for the Kattars, Rosen told him that there was nothing in writing and no specific agreement, which information Rodman later relayed to the trustee.

In November 1994, the trustee ultimately accepted Dwelley's second written offer for the Maine properties, which again offered $500,000, but with a higher initial deposit. That offer tracked the language of the first offer letter and had been mailed to Rosen, who then forwarded it to the trustee. The trustee sought bankruptcy court approval for the sale. On January 3, 1995, Rosen attended the bankruptcy court hearing on the motion to sell the property to Dwelley, and said nothing to contradict the notion that Dwelley's $500,000 was the best available offer for the debtor's Maine property, or to indicate that a larger offer of $1 million had been contemplated by Dwelley.

Before the scheduled closing, an attorney working for Dwelley in Maine asked Rosen to explain the employment arrangement regarding the Kattars. That attorney, Laurie Dart, then informed the trustee that there may have been additional arrangements for future payments to the Kattars. Upon hearing of the previously undisclosed arrangements, the trustee filed a motion to revoke the court-approved sale of the Maine property.

In the fall of 1995, the trustee ultimately received a third offer from Dwelley, and entered into an agreement to sell the Maine property to Dwelley for $730,000 in cash. No terms regarding any subsequent payments (or regarding the Kattars' employment) were part of the final sale transaction.

At trial, the government sought to prove that Rosen's failure to disclose information regarding what the government referred to as the "side agreement" with Dwelley was a fraudulent scheme intended to prevent the trustee from receiving as much as possible from the sale of the debtor's estate. Specifi-

cally, Rosen was charged with using the mails in the course of tricking the trustee into approving a $500,000 sale which in fact was a $1 million dollar sale, with the remainder to be paid to the Kattars and Rosen. The four counts of Rosen's indictment under 18 U.S.C. § 1341 comprised of two mailings related to each of Dwelley's two offers to purchase the property for $500,000—including mailings from Dwelley to Rosen that Rosen forwarded to the trustee in July and October 1994.

The jury rendered guilty verdicts on all four counts. Prior to the end of trial, the district court denied Rosen's motion for judgment of acquittal. On appeal, Rosen again argues that there was insufficient evidence to support a mail fraud conviction, in essence because there was not a binding employment agreement between Dwelley and the Kattars.

## DISCUSSION

■  Rosen's chief contention on appeal is that to support his conviction under 18 U.S.C. § 1341, the government bore the burden of proving beyond a reasonable doubt that a binding employment agreement existed between the purchaser, Dwelley, and Rosen's clients, the Kattars, that Rosen failed to disclose. Thus, Rosen argues that either his motion for judgment of acquittal should have been granted—because such proof was not offered—or, in the alternative, his proposed jury instruction stating that proof of an employment agreement was necessary to support a guilty verdict should have been incorporated into the district court's instructions.

Without doubting that a binding employment agreement would have made Rosen's incomplete disclosures to the trustee more egregious, or more obviously illegal, we find that proving Rosen's failure to disclose a *binding* agreement was not a necessary prerequisite to establishing this mail fraud violation. When the evidence is viewed as a whole, in the light most favorable to the verdict, drawing all credibility issues in favor of the verdict, as is appropriate in reviewing a sufficiency claim, *see, e.g., United States v. Fulmer*, 108 F.3d 1486, 1490 (1st Cir.1997), we see a set of facts that would be sufficient

to "allow a rational jury" to render a guilty verdict. *Id.; see also United States v. Batista–Polanco*, 927 F.2d 14, 17 (1st Cir.1991) (stating standard of review for sufficiency claims).

██ The elements of a mail fraud offense under 18 U.S.C. § 1341[2] are: (1) the defendant's knowing and willing participation in a scheme to defraud with a specific intent to defraud; and (2) the use of the mails in furtherance of the scheme. *See United States v. Montminy*, 936 F.2d 626, 627 (1st Cir.1991) (listing elements of mail fraud); *see also United States v. Ruiz*, 105 F.3d 1492, 1501 (1st Cir.1997) (same). A defendant need not have been successful in his scheme to defraud in order to be convicted under the mail fraud statute. *See United States v. Jordan*, 112 F.3d 14, 19 (1st Cir.), *cert. denied*, —— U.S. ——, 118 S.Ct. 318, 139 L.Ed.2d 245 (1997). Section 1341's scope is broad. It covers deceptive schemes to deprive victims of a wide variety of tangible and intangible property interests; such a scheme must, at a minimum, contemplate either some "articulable harm" befalling the fraud victim or "some gainful use" of the object of the fraudulent scheme by the perpetrator, regardless of whether this use is profitable in the economic sense. *United States v. Czubinski*, 106 F.3d 1069, 1074–75 (1st Cir.1997).

Direct proof of fraudulent intent is often difficult to find, and thus we have long permitted the inference of fraudulent intent from circumstantial evidence. *See, e.g., United States v. Goodchild*, 25 F.3d 55, 60 (1st Cir.1994). Here, there was ample evidence to support the jury's conclusion that Rosen acted with the purpose of defrauding Tri–State's trustee in bankruptcy of amounts that a buyer, Orland Dwelley, was willing to pay for the debtor Tri–State's Maine property. It is certainly not irrational to conclude that information regarding Dwelley's willing-ness to pay a total of one million dollars over time would have been valuable to the trustee, regardless of whether it was proven that Dwelley would have been willing to pay what he later paid, namely $730,000, at the time of his second offer of $500,000.

The letters between Rosen and Dwelley in July 1994 support the conclusion that a side agreement to employ the Kattars—and for Dwelley to thereby pay a total of approximately $1 million—existed. The language of Dwelley's reply letter to Rosen dated July 14, 1994 is particularly telling, stating that "[w]e (together with our associates) are willing to pay a total of $1,000,000 for the Property in approximately the following manner: $500,000 upon delivery of a Deed ... and the balance ... over a period of years." Comparing these letters with the testimony of the trustee and with the offer letters to the trustee indicates that Rosen was not forthcoming in his representations regarding the structure of the asset sale. Furthermore, Rosen asked Dwelley in writing to "not give [the trustee or his associate] the salary details about your agreement to hire the Kattar boys if the sale goes through." All of this evidence can support a rational jury's conclusion that Rosen, in structuring the initial offer by Dwelley, sought to induce the trustee "into believing that a $500,000 offer had been made to buy the Maine property, when in fact the offer was for $1 million," as Rosen's indictment alleged.

Rosen argues that any side agreement between the Kattars and Dwelley was not binding. The side agreement need not have been binding, however, in order to establish that hiding the information from the trustee satisfied the element of a "scheme or artifice to defraud" in this case. 18 U.S.C. § 1341. A rational jury could have found that a legally non-binding agreement between Rosen and Dwelley regarding a $1 million dollar purchase price was intentionally kept hidden

---

**2.** 18 U.S.C. § 1341 (Supp.1997) provides in pertinent part:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purposes of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, ... or takes or receives therefrom, ... any such matter or thing, shall be fined under this title or imprisoned not more than five years, or both.

from the trustee, and that regardless of its non-binding nature, the trustee was thereby tricked into believing that $500,000 represented the extent of Dwelley's interest in the properties. Simply put, from the point of view of the trustee, the value of the information that Rosen concealed derives from the fact that Dwelley may have been willing to pay more than $500,000 for the property—it does not turn on whether that interest was fixed in a legally binding agreement.

A mail fraud conviction may be based on a defendant's "deceptive conduct," a category that certainly may include the dissemination of incomplete information, where the specific intent to defraud exists. *McEvoy Travel Bureau, Inc. v. Heritage Travel, Inc.,* 904 F.2d 786, 791 (1st Cir.1990); *see also United States v. D'Amato,* 39 F.3d 1249, 1257 (2d Cir.1994) (" '[T]he withholding or inaccurate reporting of information that could impact on economic decisions can provide the basis for a mail fraud prosecution.' ") (quoting *United States v. Wallach,* 935 F.2d 445, 462–63 (2d Cir.1991)). The jury could choose not to believe Rosen's explanation for his failure to disclose the understanding reached with Dwelley, which is that he believed the trustee did not want to entertain offers that involved payments over time. A rational jury could also infer an intent to harm the debtor estate, which under the most basic bankruptcy law principles is entitled to the full value of the consideration paid for an estate asset. 11 U.S.C. § 541(a)(6); *see, e.g., United States v. Knight,* 336 U.S. 505, 508, 69 S.Ct. 704, 706, 93 L.Ed. 845 (1949) ("All the consideration which is paid for a bankrupt's assets becomes part of the estate. No device or arrangement, however subtle, can subtract or divert any of it.").

■ Rosen also seems to argue that the indictment itself alleged that a binding employment agreement was part of the fraudulent scheme. We might concur, but for the fact that Rosen himself described the correspondence with Dwelley as an "agreement." He cannot now be heard to complain about the government's and court's adoption of his own definition. It follows that the district court did not err in failing to instruct the jury that it must find that a binding agreement between Dwelley and the Kattars was formed. Our review of an alleged legal error in a jury instruction is *de novo.* We find no error in the district court's instructions, which informed the jury that the government "must prove beyond a reasonable doubt that there was an agreement to pay additional money," and that gave an acceptable definition of an "agreement" as requiring that the parties manifest an agreement to the same terms. As discussed above, the mail fraud statute plainly does not require that Rosen's deceptive behavior regarding a buyer's true level of interest be in relation to a binding, as opposed to a non-binding, agreement with the buyer to pay additional sums of money.

■ Finally, relying on *United States v. D'Amato,*[3] Rosen argues that, in the absence of a necessary harm resulting from the fraudulent scheme, the government had to prove Rosen's intent to defraud with independent evidence. *See D'Amato,* 39 F.3d at 1257 ("Where the scheme does not cause injury to the alleged victim as its necessary result, the government must produce evidence independent of the alleged scheme to show the defendant's fraudulent intent."). We disagree with the premise that Rosen's scheme does not necessarily contemplate a harm. Viewing the evidence in the light most favorable to the verdict, we see an attempt to prevent all of the proceeds of an asset sale from going to the debtor's estate itself. To deprive the trustee of a debtor in bankruptcy of accurate information regarding greater amounts that a potential buyer is willing to pay is harm enough. *Compare with Czubinski,* 106 F.3d at 1074 (no deprivation of property interest in confidential information for purposes of federal fraud statute where no gainful use or other articulable harm followed from mere browsing of taxpayer files). Here, once the side agreement was unearthed, the trustee took quick steps

---

**3.** Rosen cites *United States v. Sawyer,* 85 F.3d 713, 715 (1st Cir.1996), for the same proposition. *Sawyer,* however, pertained to proof regarding the elements, not of § 1341, but of § 1346, the "honest services fraud" provision. The citation to *Sawyer* thus adds nothing to Rosen's argument under *D'Amato* on this point.

to dissolve the approved $500,000 sale, and eventually sold the property to the same buyer at $730,000. The two cases cited by Rosen in support of his contention that no harm is implicated here are readily distinguishable on the facts. *See United States v. Jain,* 93 F.3d 436 (8th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 2452, 138 L.Ed.2d 210 (1997) (reversing conviction where there was no evidence of harm to patients from scheme in which hospital paid kickbacks to referring psychologist); *United States v. Ashman,* 979 F.2d 469, 479 (7th Cir.1993) (violation of a commodity brokerage practice not a deprivation of property because customer would have received identical price). Unlike in *Jain* and *Ashman,* the scheme at issue here threatened to place its victim in a tangibly worse position, namely one in which a trustee could not extract the maximum value for the debtor's assets.

## CONCLUSION

For the reasons stated in this opinion, we *affirm* the judgment of the district court.