**In re the SEIZURE OF ALL FUNDS IN ACCOUNTS IN the NAMES REGISTRY PUBLISHING, INC., Sterling Who's Who, Inc., Who's Who of Retailers, Inc., William's Who's Who, Inc., Who's Who Executive Club, Bruce Gordon, Who's Who Worldwide Registry, Inc., Publishing Ventures, Inc., including but not limited to Marine Midland Bank Account Nos. 018–78090–3, 018–78047–4, 018–78044–0, 018–78055–5, 018–78153–5, 018–78173–0, Sterling National Bank & Trust Company of New York Account Nos. 035–79716–07, 031–43410–01, 031–43402–01, Republic National Bank for Savings Account No. 2601001775, and All Funds Traceable Thereto, Defendants.**

**Bruce GORDON, Who's Who Worldwide Registry, Inc., Sterling Who's Who, Inc., Registry Publishing, Inc., Who's Who of Retailers, Inc., William's Who's Who, Inc., Who's Who Executive Club, Publishing Ventures, Inc., Petitioners,**

v.

**UNITED STATES of America, Respondents.**

Nos. M 95–0523 (JMA), CV 95–1418 (ADS).

United States District Court, E.D. New York.

May 30, 1995.

Gerald L. Shargel, New York City, (Vivian Shevitz, of Counsel), for petitioners.

Zachary W. Carter, U.S. Atty., E.D. New York, Gary R. Brown, Sarah Lum, Ronald G. White, Asst. U.S. Attys., Brooklyn, NY, for U.S.

SPATT, District Judge:

The methods of contemporary telemarketing have become sophisticated in the "information age," relying a great deal on demographic statistics and public opinion surveys. One popular method used in telemarketing is selecting potential customers from mailing list data bases that have been refined to delineate their addressees by any number of possible criteria and characteristics. Indeed, such lists are so fundamental and useful in direct mail advertising or contribution solicitation that they are bought and sold through brokers in an open market, much like other commodities.

Moreover, to survive in today's competitive business environment some businesses utilize aggressive telemarketing techniques. The character of such techniques, often accompanied by bodacious hyperbole, at times borders on deceit and creates a shady area between sharp sales practice and criminal fraud.

In the present case, the Court is asked to determine whether a business using refined mailing lists to aggressively solicit customers for inclusion in its version of a "Who's Who" registry crossed the hazy line from sharp sales practice to criminal fraud. The Government contends that the line was crossed, and has seized certain of the companies' bank accounts, totalling an estimated $511,731. On the other hand, the companies contend that at the worst their conduct constituted sales "puffery," but not criminal fraud. They move to dismiss the *in rem* seizure warrant on the ground that no crime has been committed, and cry foul at the Government's *ex parte* seizure of their bank accounts, which they contend has virtually destroyed their business.

## BACKGROUND

### 1. The Bruce Gordon "Who's Who" Businesses.

The companies involved in this case are Who's Who Worldwide Registry, Inc. ("Worldwide"), Sterling Who's Who, Inc. ("Sterling"), Who's Who Executive Club, Who's Who Worldwide Communications, Tribute Magazine, Registry Publishing, Inc., Publishing Ventures, Inc., Who's Who of Retailers, and William's Who's Who (collectively the "Companies").

Bruce Gordon ("Gordon") founded the Companies with investment capital supplied by his brother and sister-in-law (Gordon and the Companies are also collectively referred to as the "Petitioners"). Gordon does not own the Companies, but he does control them. The Companies are not affiliated in any way with the entity that originally published the "Who's Who" directory in the United States, Marquis Who's Who, which is presently owned and published by Reed Elsevier, Inc. ("Reed Elsevier"). Indeed, because of Gordon's use of the term "Who's Who" in his companies' names, Reed Elsevier commenced a civil action against Worldwide under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) for trademark infringement and false designation of origin. *See Reed Elsevier, Inc. v. Who's Who Worldwide Registry, Inc.,* CV 92–3959 (ADS). That case was tried by consent of the parties before former United States Magistrate Judge David F. Jordan, who issued a decision on March 31, 1994 finding that Reed Elsevier's mark was infringed, and among other things awarding $1,649,000 in damages to Reed Elsevier. As a result of not being able to satisfy the judgment Worldwide filed a petition for Chapter 11 bankruptcy protection. Judge Jordan's decision is presently being appealed to the United States Court of Appeals for the Second Circuit.

Gordon incorporated Worldwide in November, 1989. The business originally entailed publishing "Who's Who Worldwide Registry" ("Worldwide Registry"), and soliciting customers to purchase a membership in the registry. Customers designated for solicitation were selected by using various mailing lists of corporate executives and other professional people. Described in more detail later in this opinion, the solicitation process used by Gordon consists of sending a letter to the potential customer, informing them that they had been "nominated" for inclusion in the registry, and that their inclusion in the registry has been confirmed by Worldwide's officers. The letter also states, among other things, that (i) the Worldwide Registry is a leading publication of accomplished individuals, (ii) inclusion in the registry is limited to exceptional people who are prominent or successful in their field, and (iii) that inclusion in the registry is without cost or obligation to the customer. The solicitation letter also includes a biographical questionnaire for the customer to complete and return, if they wish to be considered for inclusion in the registry.

After receiving the biographical information, the company contacts the customer and aggressively solicits them to purchase a membership in the registry. Membership includes receiving a copy of the bound volume of Worldwide Registry, which lists all of the members and certain biographical information in coded form. The salesperson making the membership solicitation to the customer reiterates that membership in the Worldwide Registry is selective and prestigious. Networking among Worldwide Registry members is also stressed as a unique aspect of membership. In order to make the purchase more attractive, members are also offered a commemorative plaque and camera ready art as part of a membership purchase.

By 1994, Gordon's business had expanded to comprise several "Who's Who" entities with over 60,000 members. In addition to the Worldwide Registry, several other "Who's Who" registries were also being published, including the Who's Who Worldwide Registry Sterling Edition ("Sterling Edition"), the Who's Who Executive Club Registry ("Executive Club Registry"), which consists of the members and listees in the Worldwide Registry and Sterling Edition, and the Who's Who of American Business Leaders, 1991 Edition. Customers can purchase lifetime, five-year, three-year, corporate or associate membership. Listing in a registry is classified according to the type of

membership bought. A typical entry in the Executive Club Registry is as follows:

**MORALES, J.M.**

President & Principal, Micro–Bac International Inc., 9607 Gray Boulevard, Austin, Tx Bus: Biotechnology, P/S: Para–Bac Oil Field Products, Org: Research & Development, MA: Worldwide, Exp: Degradation of Substance, FM: Forbes, FV: Mexico, H/S: Traveling/Football.

*Who's Who Executive Club Registry 1994–1995*, at 101. A listing of codes at the beginning of the registry explains that "Bus" refers to type of business, "P/S" to major product or service, "Org" to type of organization, "MA" to marketing area, "Exp" to expertise, "FM" to favorite magazine, "FV" to favorite vacation place, and "H/S" to favorite hobbies and sports.

In addition to receiving a free registry, wall plaque and camera ready art, Gordon's Companies offered members a host of other support services, such as a subscription to a magazine entitled *Tribute,* a Gold Master-Card, public relations services, discounts on telephone service, and airborne express service. Gordon used two offices for his business operations; one in Lake Success, New York and on Lexington Avenue in Manhattan, New York.

Debra Benjamin is the membership director and vice-president of marketing for Worldwide, and also the executive editor of *Tribute* magazine. In an affidavit accompanying the petitioner's documents, she describes Worldwide Registry's membership services in the following manner:

We offer a variety of services to our members. Among these are Tribute Magazine, a magazine which focuses on our members, with profiles of members and their companies, as well as articles about other subjects we believe will appeal to our readership[.]

Among other services we offer to our members are a variety of discounted services, including discounts in residential and business telephone service, Airborne Express discounts which allow occasional users to receive corporate rates, a Gold MasterCard through MBNA Bank, and discounted professional public relations services from our own office staff[.]

We have sponsored networking parties for our members. . . . [W]e have also offered, through an outside tour operator, an attractively priced trip to Vietnam and Hong Kong in conjunction with a lawyers' organization. Although we had inquiries from some members, no one signed on to go[.]

We also give our members, free as a part of their membership, a beautifully bound registry of members' names and business related information submitted by them, an engraved plaque showing their membership in Who's Who Worldwide, and camera ready art of our organization's logo for their own use. We offer, for purchase, a CD Rom that contains all the registry information and allows members to access information about other members using fourteen user definable fields[.]

We seek managerial business and professional people who are high ranking in their fields. It is true that we choose most of our names from mailing lists, but the lists themselves are selective. We obtain the mailing lists from list brokers ... and we are demanding in what we ask for. We ask for industry-specific lists and specify certain titles within each of those industries. For example, in a health care industry list, we would ask for and accept only titles such as president, chairman, or chief of staff[.] We also obtain names for potential new members through nominations by our current membership[.]

For people who return their applications indicating that they are interested in being considered for membership, and who are then interviewed by telephone and qualify—but ultimately choose not to be members—there is a special section of the registry denominated "Listees". As space permits, these non-members are listed by name and address, since they have qualified for membership and have indicated their interest in being included in the registry[.]

*Affidavit of Debra Benjamin* dated April 9, 1995 ("Benjamin Affidavit"), attached as part of Exhibit B to the Declaration of Vivian Shevitz dated April 10, 1995 in support of

petitioner's Order to Show Cause ("Shevitz Declaration").

### 2. The Investigation of Gordon's Companies.

Based on complaints regarding the Companies' business practices received from, among others, the New York State Department of Law, the New York State Consumer Protection Board and the Better Business Bureau, the United States Postal Inspection Service ("Postal Service") commenced an investigation of Gordon and his companies in July, 1994. The investigation involved (i) review of the complaints received by the Postal Service from the aforementioned organizations, (ii) information from six confidential informants with inside knowledge of the Companies' practices, (iii) undercover recordings of phone solicitations by the Companies, and (iv) review of documents filed in connection with the trademark infringement suit in *Reed Elsevier, Inc. v. Who's Who Worldwide Registry, Inc.*

The investigation culminated in a 115 page complaint and affidavit ("Complaint"), sworn to by Postal Inspector Martin T. Biegelman ("Biegelman") and dated March 22, 1995. The Complaint concludes that based on the Postal Service's investigation, the Companies' business operations constituted a "telemarketing boiler room" operation using "high pressure telephone sales pitches that misrepresent the identity of the Company and the nature of the products in order to defraud customers into purchasing one of the Company's 'Who's Who' directories and other products." Complaint at 11. According to Biegelman, since 1989 Gordon and the Companies have defrauded customers of approximately $22 million dollars. The Complaint charges that the Companies' use of the mail and telephones to make the solicitations was in furtherance of a scheme to defraud people, and constitutes a violation of the mail and wire fraud statute, 18 U.S.C. §§ 1341 and 1343.

The Complaint alleges that in December 1989 Biegelman conducted an investigation of an allegedly similar "boiler room" operation involving Who's Who in American Executives, Inc. and other companies operated and controlled by Steven Samuel Warstein, a/k/a

Steven West ("West"). West, his wife and eighteen managers and salespersons were charged with mail and wire fraud, and eventually pleaded guilty to the charges. One of the salespersons involved in the West companies who eventually pled guilty left West in August, 1991 to work for Gordon at Worldwide. This person operated as a confidential informant, CI-6, for Biegelman in the present case.

According to Biegelman, Gordon started his operation by patterning it on the West operation, which had been described to Gordon by a former employee of West. Allegedly, this former employee also provided Gordon with copies of West's solicitation letters, applications and sales scripts for use when soliciting customers. Biegelman's Complaint goes on to describe the solicitation letters used by Gordon's salespersons and the follow-up telephone solicitation seeking a membership purchase.

Contrary to what prospective customers are told in solicitation letters and phone calls, Biegelman alleges that, among other things, Worldwide's and Sterling's (collectively the "Company's") solicitation letters and salespersons make fraudulent representations with regard to the nomination and selection process for membership in a registry, the prestige of the registry, the lack of any cost for being included in a registry, the identity of other members of the registry, the utility of the registry as a networking tool, and the ability of the Company to sponsor seminars and conferences. Moreover, Biegelman alleges that Company salespersons use script or "pitch" sheets when talking to a customer that they know contain false information, and that registries or other membership products are not prepared until many months after a customer accepts membership.

As part of his investigation, Biegelman relied on information supplied from six confidential informants ("CIs") who either worked at one of the Companies, or posed as a potential customer. According to Biegelman, at the time of supplying the information to him, each one of these CIs was awaiting sentencing for mail and/or insurance fraud as a result of guilty pleas entered in relation to

the charges arising from the West Company fraud or another boiler room fraud operation. Marvin Gross, who is CI–6, has also pleaded guilty before United States District Judge Jacob Mishler on November 21, 1994, to a one count information charging him with conspiracy to commit mail and wire fraud in connection with the alleged criminal activities of Gordon's Companies. The plea was made pursuant to a cooperation agreement with the Government, and Gross has not yet been sentenced.

Beigelman alleges that CI–1 posed as a customer and recorded numerous telephone conversations and meetings with salespersons at the Companies, which he then passed on to Biegelman. CI–2, CI–3, CI–4 and CI–5 were employees of one or another of the Companies, and acted as undercover informants for Biegelman. Each of these CIs wore a concealed tape recorder and recorded conversations with salespersons. These recordings were passed on to Biegelman. CI–3 also posed as a customer and recorded telephone solicitations with salespersons.

As mentioned previously, CI–6 was a sales person at the West Company who left West to join Worldwide in August 1991. According to CI–6, Gordon prepared the pitch sheets containing the false information that salespersons used for solicitations. This allegedly false information included telling customers they were nominated for membership, that the Company sponsored conferences and seminars for members, and that the Company had offices nationwide. CI–6 also related to Biegelman that the salespersons at the Company knew the information in the pitch sheets was false. In addition, CI–6 told Biegelman that Gordon directed salespersons to use aliases when talking with customers, and that several former West employees were working for Gordon. CI–6 was fired by Gordon in January 1995 because he failed to meet his sales quota.

From August, 1994 through March, 1995, Biegelman had CI–1 and CI–3 test the Company's representations regarding nomination and the selectivity of membership by having the CIs call the Company and pose as potential customers. Approximately eighty-five phone calls were made to the Company during this period. According to Biegelman, during these calls the CIs posed as dentists, policemen, office managers, sales managers, a delicatessen owner and other "non high-level" business occupations. In each of these cases, Biegelman alleges that the CIs were accepted for membership by the Company, even though they were not a company president, vice president or chief executive officer.

Based on all of the information provided to him by the CIs, the complaints forwarded to him by the Better Business Bureau and New York State and the other documents he reviewed, Biegelman made the following specific allegations of fraud against Gordon and the Companies (which he refers to as the "Company") in the Complaint:

1. The Company falsely represents to customers that it is a long standing, well known and recognized business which publishes highly selective, prestigious and authoritative biographical directories. In truth, the Company has only been in existence since 1989 and is the subject of frequent customer complaints regarding dishonest business practices. In addition, the Company's directories are neither highly selective nor well recognized and authoritative.

2. The Company falsely represents to customers in solicitation letters that they were nominated by one or more of the established members of Who's Who Worldwide and Sterling Who's Who for inclusion in its directories. In truth, customers are almost exclusively solicited from mailing lists purchased by the Company from outside sources.

3. The Company falsely represents to customers in solicitation letters that their inclusion in the Company's directories is without cost or obligation on the part of the customer. In truth, customers must purchase a membership to be listed in the Company's directories.

4. The Company falsely represents to customers in solicitation letters that the majority of new candidates who are nominated are not accepted for inclusion. In truth, anyone who is willing to purchase a membership is accepted.

5. The Company falsely represents to customers in solicitation letters that its Office of Public Affairs or Board of Review evaluates nominees in accordance with specific standards of achievement. In truth, there is no Office of Public Affairs or Board of Review at the Company that evaluates customers' specific standards of achievement.

6. The Company falsely represents to customers in solicitation letters the identity of the sender of the letters. The numerous letters sent to customers since at least 1990 are signed on behalf of the Company in the names of fictitious persons.

7. The Company falsely represents that members of its directories like to anonymously nominate potential new members of the directory. In truth, the names of virtually all the individuals contacted by the Company are obtained through mailing lists purchased by the Company.

8. The Company falsely states that an exclusive committee at the Company decides who will be accepted for membership, based on the candidate's individual achievements. In truth, customers are accepted for inclusion in one of the Company's directories based on one criteria: whether they agree to purchase a membership.

9. The Company falsely represents to customers who have been "nominated" for membership that their names were not obtained from mailing lists. In truth, the names of virtually all the individuals contacted by the Company are obtained through mailing lists purchased by the Company.

10. The Company falsely represents to customers that it does not solicit new members for its directories. In truth, the Company employs a large, full-time sales force to solicit new customers to become members and to purchase the Company's directories. In fact, salespeople are required to meet rigid sales quotas to avoid being fired.

11. The Company falsely states to customers that it is a member-owned and member-run organization. In truth, the Company is owned and operated by Bruce Gordon. Members have no ownership interest in the Company and have no say in how it is run.

12. The Company falsely represents that potential members must engage in a qualifying interview to prove they are a leading person in their profession. In truth, the qualifying interview is a ruse to gain the customer's confidence, so that an attempt can be made to sell the customer a membership and other Company products. In fact, customers interviewed are rarely disqualified so long as they do not object to the sales pitch, or are willing to purchase Company products.

13. The Company makes misleading statements in telephone pitches to customers regarding the involvement of famous people with the Company. For example, Barbara Walters of "20/20" and Russian President Boris Yeltsin, are described as members of the Company's directories. In fact, neither has ever had any involvement with the Company.

14. The Company makes false and misleading statements to customers concerning the directory's closing, printing and shipping dates to pressure customers into a quick sale. In truth, customers are frequently told months in advance of any printing deadlines that the deadline for inclusion in the directory will expire shortly.

15. The Company falsely represents to customers that memberships are limited, that they are not always available and that new openings come about only through the attrition of existing members. In truth, there is no limitation on the number of memberships and the availability of memberships is not based on attrition, but rather on the ability and willingness of a customer to pay the membership fee.

16. The Company falsely represents that the offer of a membership is a once-in-a-lifetime event and that once a membership is declined, the customers must be re-nominated if they wish to be considered for membership again. In truth, anyone can become a member at any time if they are willing to pay the membership fee. In

addition, the Company frequently re-contacts customers who have declined a membership in order to try to sell them a less expensive membership.

17. The Company falsely represents that, when a customer agrees to become a member, a press release announcing his membership will be sent to each of the other members. In truth, such press releases are not sent to other members.

18. The Company falsely represents to customers that its directories are invaluable tools for networking among members. In truth, the directory does not contain home or work telephone numbers nor zip codes, which makes it virtually useless for any networking purposes.

19. The Company falsely represents that it sponsors conferences and seminars in foreign countries or at posh resorts, where members can meet and network with each other. Customers are told, for example, of successful and well-attended conferences on international trade in Hong Kong and Vietnam, and of a golf and tennis networking event in Hilton Head, South Carolina. In truth, no such conferences or events were ever held or sponsored by the Company.

Complaint at 25–29.

Finally, Biegelman alleges that these accusations are supported by Judge Jordan's findings and conclusions in the trademark infringement action between Reed Elsevier and Worldwide. Biegelman cites to the March 8, 1994 decision of Judge Jordan, in which he held that in addition to infringing on Marquis's Who's Who trademark, Worldwide also falsely described its products in solicitations to customers. According to Judge Jordan, these false descriptions included statements concerning (i) the nomination of customers, (ii) the worldwide scope of the company's operations, (iii) the prestige and selectiveness of the Worldwide Registry, (iv) the networking utility of the registry, and (v) the lack of cost to a customer for being listed in the registry. *See Reed Elsevier, Inc. v. Who's Who Worldwide Publishing, Inc.*, No. CV 92–3959 (DFJ) (March 8, 1994), Findings of Fact, Conclusions of Law, Decision and Order at 16–19.

### 3. The Seizure and Present Motion.

Grounded upon Biegelman's Complaint, on March 22, 1995, United States Magistrate Judge Joan M. Azrack signed warrants for the arrest of Gordon and twenty nine of the Companies' salespersons. On March 29, 1995, the United States obtained an *ex parte* warrant of seizure pursuant to Rule 41 of the Federal Rules of Criminal Procedure from Judge Azrack, authorizing the seizure of funds on deposit in certain of the Companies' bank accounts. According to the affidavit in support of the seizure warrant, sworn to by Biegelman, the funds on deposit in the accounts are controlled by Gordon, and contain the proceeds of his alleged fraud scheme. The Government contends that these funds are subject to forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(A) and (C), because they are, respectively, transactions or attempted transactions at money laundering, and are the proceeds of mail and wire fraud.

The arrest warrants for Bruce Gordon and the salespersons were executed on March 30 and March 31, 1995. None of these persons has been indicted, and as of yet, only one, Marvin Gross—who is Biegelman's CI–6—has pleaded guilty pursuant to a cooperation agreement to an information charging one count of mail and wire fraud.

On April 10, 1995, Gordon and his Companies brought an Order to Show Cause challenging the legality of the seizure, and seeking the return of the seized property pursuant to Fed.R.Civ.P. 41(e). The essential contention of the Petitioners' motion is that the criminal Complaint should be dismissed and the seized property be released because no crimes were committed. According to the Petitioners, there is no probable cause for believing that mail and wire fraud were committed, and, therefore, the accounts are not forfeitable and thus not subject to seizure.

The Petitioners also contend that the Government did not conduct a proper investigation of the matter, but rather erroneously embraced the findings by Judge Jordan in the trademark infringement case, and improperly analogized Gordon's operations to West's operations. Among other things, the

Petitioners contend that the Government failed to interview customers who were satisfied with their membership in the Companies, and failed to note critical distinctions between the present case and the West case.

The Petitioners contend that, even if, arguendo, some fraud was committed, it was limited to a small amount of customers. In the Petitioners' view, the proceeds traceable to such a minuscule amount of fraud does not warrant a seizure of the magnitude conducted by the Government in this case. Moreover, the Petitioners contend that some seized funds should be released to allow the Petitioners to continue their business and pay counsel fees. If release of funds is not granted expeditiously, the Petitioners maintain that the Companies will be forced out of business.

Relying on recent decisions concerning the interplay of seizure of alleged forfeitable assets and due process concerns, the Petitioners insist that they are entitled to a hearing on probable cause on several grounds. First, they contend that a probable cause hearing is necessary under *United States v. Monsanto*, 924 F.2d 1186, 1203 (2d Cir.) (holding that where funds are required to pay for criminal defense from allegedly forfeitable assets that are seized *ex parte*, the fifth and sixth amendments require an adversary, post-restraint, pre-trial hearing to determine whether there was probable cause that the defendant committed the crimes that provide the basis for forfeiture), *cert. denied*, 502 U.S. 943, 112 S.Ct. 382, 116 L.Ed.2d 333 (1991), in order to release funds so that counsel can be retained and paid.

Second, the Petitioners contend that the *ex parte* seizure of the accounts without a pre-deprivation hearing violated their due process rights. According to the Petitioners, there were no exigent circumstances in this case necessitating an *ex parte* seizure, especially one which has the practical effect of shutting down a business. Therefore, the Petitioners maintain that, under *United States v. All Assets of Statewide Auto Parts, Inc.*, 971 F.2d 896, 905 (2d Cir.1992) (to the extent a due process, post-deprivation hearing regarding whether a business has been completely destroyed by the *ex parte* seizure

of its assets is based on a challenge to the seizure and forfeiture, it implicates a probable cause evidentiary hearing), a post-deprivation hearing regarding probable cause is necessary.

The Petitioners further contend that a probable cause hearing is necessary because the Government's representations to Judge Azrack concerning the alleged fraud, which were relied upon to sign the warrants of arrest and seizure, constitute deliberate falsehoods or a reckless disregard for the truth in violation of *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

In addition, the Petitioners claim that a letter sent to members of the Worldwide and Sterling Registries by Biegelman after the arrests on March 30 and March 31, 1995, which announces the arrests on charges of mail and wire fraud and includes a five-page questionnaire regarding the member's experience with the Companies, is premature, reckless, and has irreparably damaged the Companies' business. The Petitioners also challenge an administrative complaint filed by the Postal Service against Gordon, Worldwide and Sterling, which seeks the issuance of orders that would prevent delivery of mail to the Companies and forbid the Postmaster General to pay any money orders drawn on the Companies. According to the Petitioners, these actions by the Postal Service are part of a deliberate and concerted effort to destroy the Companies' business prior to any determination of the merits of the criminal charges.

The Petitioners' motion seeks the following relief: (1) an order directing the Government to return all bank accounts and other property seized, or alternatively, an immediate hearing or the propriety of the seizure and/or release of part of the funds for the Companies' ordinary and necessary business and counsel expenses; (2) an order directing the Government, and the United States Postal Inspectors, to cease contacting and sending questionnaires to members and customers of Who's Who Worldwide and Sterling Who's Who, and to cease disseminating information to the public about arrests and charges relating to Gordon's Companies; (3) an order enjoining the Postal Service's administrative

proceeding in connection with the Complaint; and (4) an order directing an accounting for damages incurred by reason of the alleged improper Government conduct.

On the other hand, the Government contends that fraud has indeed been committed, because the Companies have knowingly made false and misleading statements during solicitations in order to fraudulently induce customers to purchase their Who's Who registries. According to the Government, the Companies misrepresent, among other things, the selectivity, uniqueness and quality of the registries they publish, and the benefits of membership in such registries. The Government argues that probable cause exists to believe the accounts are the proceeds of mail and wire fraud.

The Government also contends that the Petitioners' due process rights have not been violated. In the Government's view, the bank accounts can be liquidated fairly quickly and, therefore, present exigent circumstances which allow an *ex parte* seizure of the accounts. Moreover, the Government contends that not all of the Companies' bank accounts were seized, and that certain accounts subject or potentially subject to Worldwide's bankruptcy proceedings remain available for the Companies to use in paying business and counsel expenses.

Because an indictment has not been filed in the related criminal actions, the Government further contends that the Petitioners are not entitled to a probable cause hearing with respect to the necessity of obtaining some of the seized money in order to pay for their counsel. In addition, the Government maintains that Gordon may not have standing to contest the seizure of the accounts, because he allegedly does not possess legal title to the companies which own the seized funds.

Finally, the Government contends that the Petitioners have not met the standard for obtaining injunctive relief against the Government. As a result, the Government claims there is neither a basis for enjoining the Postal Service from pursuing its administrative proceedings against Gordon and his Companies, nor a basis for enjoining the Government and grand jury from continuing

its investigation of the alleged mail and wire fraud by sending the questionnaires to the Worldwide and Sterling members. Indeed, the Government suggests that such an injunction is an unconstitutional intrusion into Executive Branch powers and violates the separation of powers doctrine.

On April 10, 1995, United States District Judge Eugene H. Nickerson granted the Petitioners' request for a temporary restraining order enjoining the Government, including the Postal Service, from (i) sending additional questionnaires to members of Worldwide and Sterling; (ii) sending letters informing the members of the arrests and seizures in this matter; and (iii) continuing the administrative proceeding brought in connection with Biegelman's Complaint. Judge Nickerson made the motion returnable on April 13, 1995, before United States District Judge David G. Trager.

At the hearing on April 13, 1995, Judge Trager did not reach the merits of the Petitioners' motion. Instead, he granted the Government's request to transfer the case to Judge Mishler, because ostensibly the case was related to another case before Judge Mishler, namely the plea by Gross. In addition, the Government contended the case was similar to the West case, which also had been before Judge Mishler. Judge Trager continued the temporary restraining order issued by Judge Nickerson. During the hearing before Judge Trager, the Government stipulated that it would not seize any of the approximately $500,000 in bank accounts belonging to the Companies that it had not yet seized, pending the hearing and resolution of the present motion. *See* Transcript of April 13, 1995 hearing before Judge Trager, at 44–48. Some of these unseized funds are subject to Worldwide's bankruptcy proceedings. Due to scheduling conflicts, Judge Mishler was not able to hear the petitioner's motion in a timely fashion. The hearing was, therefore, held before United States District Judge Joanna Seybert on April 19 and April 20, 1995.

On April 19th, the parties addressed the Petitioners' entitlement to a hearing challenging the seizure. The Petitioners essen-

tially pressed the four grounds for a hearing that they raised in their motion. First, the Petitioners argued that a post-deprivation hearing was required under *Statewide,* on the ground that the *ex parte* seizure of the accounts violated the Petitioners' due process rights because there were no exigent circumstances warranting the *ex parte* seizure. Second, the Petitioners contended that there was no probable cause to support the warrant, and therefore, a hearing was necessary (i) under Rule 41(e) in order for the Government to show probable cause for believing that the accounts are subject to forfeiture, and (ii) under *Franks v. Delaware,* because Judge Azrack allegedly signed the seizure warrant on the basis of affidavits containing false statements. Third, the Petitioners contended that in order to create a record for an immediate appeal under *Statewide* if their motion is denied, they were entitled to a hearing on whether the seizure of the accounts has effectively shut down the Companies from operating. And fourth, the Petitioners contended that a probable cause hearing was required under *Monsanto,* because the Companies were precluded by the seizure from obtaining funds to pay counsel fees in this case, and for defending Gordon in the criminal case.

Initially, on April 19th Judge Seybert found that a probable cause hearing was not warranted at that point in time, because probable cause had been determined by Judge Azrack to be sufficient on the papers submitted to her. According to Judge Seybert, a review of the papers apparently confirmed her view that the papers were sufficient for the warrant to issue and the seizure to be made, and that a *Franks* hearing was not necessary. *See* April 19, 1995 Tr. at 44–45, 63. Nevertheless Judge Seybert did raise two concerns regarding proof of tracing the victims' money to the accounts, and the scope of the warrant and seizure. April 19, 1995 Tr. at 45, 63–64. After some argument, Judge Seybert also determined that a hearing was necessary on the issue of whether the seizure effectively shut down the Companies. She therefore allowed the hearing to proceed on that basis, in order to create a record for an immediate appeal by the Petitioners under *Statewide,* should the Court

deny the motion to vacate the warrant. *See* April 19, 1995 Tr. at 60, 63–64.

The next day, however, after looking at the constitutional concerns raised in the *Monsanto* and *Statewide,* Judge Seybert granted the Petitioners' request for a probable cause hearing. *See* April 20, 1995 Tr. at 2–3, 14–16, 21.

The hearing on April 20, 1995 consisted entirely of the testimony of Biegelman. Written submissions supplementing the hearing by the Petitioners and the Government were respectively filed on April 24 and April 26, 1995. Judge Seybert found it necessary to recuse herself after the hearing, and this case, including the decision on the Petitioners' motion, was reassigned to this Court. At a conference held on May 5, 1995, the parties agreed that the Court need not conduct a new hearing on the Petitioners' motion, and that a decision on the motion could be rendered based on the hearing transcripts and the parties' submissions.

The Court has reviewed the entire file in this case, all the hearing transcripts, the exhibits entered into evidence at the hearing including the tape recordings made by CI–1 and CI–3, and the pre and post-hearing submissions of the parties. The Court further heard argument on the respective position of the parties during the May 5, 1995 conference. The Court's findings and opinion are set forth below.

## DISCUSSION

### 1. Applicable Law.

#### A. *Probable Cause.*

 In order for property to be seized, the government must have probable cause to believe that the seized property is subject to forfeiture. *See* 18 U.S.C. §§ 981(b)(1)(A)(i) and 981(d); *Marine Midland Bank, N.A. v. United States,* 11 F.3d 1119, 1126 (2d Cir. 1993) (seizure is not valid unless there is probable cause to believe the property is subject to forfeiture); *United States v. Daccarett,* 6 F.3d 37, 50 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1294, 127 L.Ed.2d 648 (1994); *United States v. $37,780 in United States Currency,* 920 F.2d 159, 162 (2d Cir.1990). Property is subject to forfei-

ture if it is the fruit or proceeds of illegal activity. *Daccarett,* 6 F.3d at 55; *$37,780 in U.S. Currency,* 920 F.2d at 162. To demonstrate probable cause, the government must prove a nexus between the property and the illegal activity. *Daccarett,* 6 F.3d at 56.

 Despite their interconnectedness, seizure and forfeiture remain two distinct statutory events. While each event requires the government to have probable cause, different consequences for each event flow from the government's failure to establish probable cause. *Daccarett,* 6 F.3d at 46; *$37,780 in U.S. Currency,* 920 F.2d at 161–62. Failure of the government to establish that there was probable cause at the time of the seizure only results in suppression of evidence gained from the improper seizure in later proceedings. The defendant property, however, itself is immune from suppression and remains subject to forfeiture. *Daccarett,* 6 F.3d at 46; *$37,780 in U.S. Currency,* 920 F.2d at 163. On the other hand, failure by the government to establish probable cause on the forfeiture issue, namely, failure to establish probable cause that the property is connected to illegal activity, will result in dismissal of the forfeiture action. *Daccarett,* 6 F.3d at 46.

 Generally, the government is not required to demonstrate probable cause for seizing property until the forfeiture trial. *Marine Midland,* 11 F.3d at 1124. However, if a claimant challenges the validity of a seizure, as the Petitioners have done here, then the merits of the forfeiture trial are expedited and the government must establish probable cause for the forfeiture prior to the forfeiture trial. *See Marine Midland,* 11 F.3d at 1124–25; *Daccarett,* 6 F.3d at 50, 55. Accordingly, the Government must demonstrate here that it had probable cause to believe that the accounts seized are subject to forfeiture. *Marine Midland,* 11 F.3d at 1125–26.

 A hearing requiring the Government to show probable cause is also triggered in certain situations prior to the filing of an indictment when funds are sought from the seized *res* in order to pay counsel fees for the criminal case underlying the seizure and forfeiture. The standards governing such a hearing were set forth by the Second Circuit in *Monsanto:*

> We conclude that (1) the fifth and sixth amendments, considered in combination, require an adversary, post-restraint, pretrial hearing as to probable cause that (a) the defendant committed the crimes that provide the basis for forfeiture, and (b) the properties specified as forfeitable in the indictment are properly forfeitable, to continue a restraint of assets (i) needed to retain counsel of choice and (ii) ordered ex parte ... (2) ... the Court may receive and consider at such a hearing evidence and information that would be inadmissible under the Federal Rules of Evidence; and (3) grand jury determinations of probable cause may be reconsidered in such a hearing.

*Id.,* 924 F.2d at 1195, 1203. *Monsanto's* holding has been extended to require a probable cause hearing in a civil forfeiture case, where the claimant is also a defendant in the related criminal matter. *See United States v. All Funds on Deposit,* 767 F.Supp. 36, 42 (E.D.N.Y.1991).

 As mentioned previously, in order to establish probable cause, the government must demonstrate a nexus between the seized property and the illegal activity. To demonstrate such a nexus when the *res* seized is a bank account, the government must establish that there is probable cause to believe the funds represent proceeds traceable to the illegal activity. *Daccarett,* 6 F.3d at 56. The government is not required to link the bank account to a particular illegal activity. *Marine Midland,* 11 F.3d at 1126. Rather, "[p]robable cause is established if the government can show that it has reasonable grounds, more than mere suspicion, to believe that the property is subject to forfeiture," namely, that the funds represent the proceeds of criminal activity. *See Marine Midland,* 11 F.3d at 1126 (citing *United States v. Banco Cafetero Panama,* 797 F.2d 1154, 1160 (2d Cir.1986)), *and Daccarett,* 6 F.3d at 56.

 Moreover, particularly in cases involving bank accounts, a finding of probable cause may be based on hearsay, including

**450**

hearsay from confidential informants or circumstantial evidence. *Daccarett*, 6 F.3d at 56 (citations omitted). In addition, great deference is paid to the probable cause determinations of magistrate judges and judges who issue warrants. Any doubts are resolved in favor of upholding the warrant, and all of the evidence is construed in a light most favorable to the government. *Marine Midland*, 11 F.3d at 1125 (citations omitted).

■■■■ Finally, after the government establishes probable cause, the burden shifts to the claimant to demonstrate by a preponderance of the evidence that the property is not subject to forfeiture, because it was not used unlawfully or because the illegal use was without the claimant's knowledge or consent. *Daccarett*, 6 F.3d at 57. If the *res* is a bank account, the claimant bears the burden of proving that the account does not contain proceeds traceable to the criminal activity, but "rather represents legitimate funds." *Id.* (citing *United States v. 785 St. Nicholas Ave.*, 983 F.2d 396, 403 (2d Cir.1993)).

The Court wishes to pause at this point in order to highlight several matters. First, the bank accounts at issue in this case were seized pursuant to a seizure warrant issued by Judge Azrack under Fed.R.Civ.P. 41(c)(1), on a determination of probable cause based on the contents of Biegelman's affidavit and Complaint. Interestingly, a forfeiture action has not yet been commenced by the Government. Moreover, a grand jury investigation into the criminal allegations continues and there have not been any indictments of the persons arrested in connection with the Companies' operations. As stated above, one such person arrested has pleaded guilty to an information, pursuant to a cooperation agreement.

Second, the Petitioners challenge the validity of the seizure under Fed.R.Civ.P. 41(e), and have requested that counsel fees be released from the seized accounts to pay for Gordon's defense in the related criminal proceedings.

■■■ Accordingly, in this Court's view, a hearing in which the Government is obligated to show that it had probable cause to believe the accounts seized are subject to forfeiture

is required, under the rule of both *Marine Midland*, 11 F.3d at 1125, and *Monsanto*, 924 F.2d at 1203. Additionally, the Court believes that to the extent the due process, post-deprivation hearing discussed in *Statewide* is based on a challenge to the seizure and forfeiture, it implicates a probable cause evidentiary hearing as well. *See Statewide*, 971 F.2d at 905.

In the present case, the Petitioners rely on two grounds to assert that the Government lacks probable cause to believe that the seized proceeds are connected to the alleged mail and wire fraud. First, the Petitioners contend that any misrepresentations contained in the solicitation letters or made by the salespersons in telephone calls constitute "mere puffing," and do not give rise to a violation of the mail fraud or wire fraud statutes. Second, they contend that, even assuming a violation of these statutes, the payments made by the alleged victims of the fraud cannot be traced to the seized bank accounts.

Because the elements of mail and wire fraud are essentially the same, *see, e.g., United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987), the Court will conduct its analysis of probable cause under the mail fraud statute.

### B. *Probable Cause for Mail Fraud*

The federal mail fraud statute provides in relevant part that a person is guilty of mail fraud, if,

> having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... for the purpose of executing such scheme or artifice or attempting so to do, [the person] places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such thing[.]

18 U.S.C. § 1341.

■■■ The elements of mail fraud necessary to establish the offense are (1) a scheme or artifice to defraud, (2) for the purpose of obtaining money or property, or of depriving

another of an intangible right of honest services, and (3) use of the mails in furtherance of the scheme. *United States v. Altman,* 48 F.3d 96, 101 (2d Cir.1995) (citing *United States v. Wallach,* 935 F.2d 445, 461 (2d Cir.1991). Moreover, proof of fraudulent intent is required. *Altman,* 48 F.3d at 101; *United States v. D'Amato,* 39 F.3d 1249, 1257 (2d Cir.1994).

■ A "scheme or artifice to defraud" under the statute is interpreted broadly, and includes everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future. *Altman,* 48 F.3d at 101 (quoting *Durland v. United States,* 161 U.S. 306, 313, 16 S.Ct. 508, 511, 40 L.Ed. 709 (1896)). The scheme to defraud need not have been successful or complete, and the victims need not have been injured. *D'Amato,* 39 F.3d at 1257; *Wallach,* 935 F.2d at 461 ("[T]he government is not required to show that the intended victim was actually defrauded."). Rather, "the government must show 'that some actual harm or injury was *contemplated* by the schemer.'" *D'Amato,* 39 F.3d at 1257 (quoting *United States v. Regent Office Supply Co.,* 421 F.2d 1174, 1180 (2d Cir.1970) (emphasis in original)); *Wallach,* 935 F.2d at 461.

■ In order for the statute to be violated in the context of solicitations to purchase a product, the alleged fraud must concern facts material to the bargain the potential customer is induced to enter through the seller's representations. The seminal case in this regard is *United States v. Regent Office Supply Co.*

In *Regent,* a company selling office supplies was accused of mail fraud, allegedly resulting from its salespersons' (called "agents") sales pitch during solicitations of orders for its merchandise. In order to expeditiously get a determination of whether the conduct and sales pitch fell within the prohibition of the mail fraud statute, the defendant agreed to be indicted and tried upon certain admissions and stipulations of fact constituting the alleged crime. The defendant basically stipulated that the agents secured sales by making false representations to potential customers that: (i) the agent had been referred to the customer by a friend of the customer, (ii) the agent had been referred to customer firm by officers of such firms, (iii) the agent was a doctor, or other professional person, who had stationary to be disposed of; and (iv) stationary of friends of the agent had to be disposed of because of a death and that the customer would help to relieve this difficult situation by purchasing it. *Id.,* 421 F.2d at 1176. The defendant explained that the false representations were made by its agents in order to get past secretaries and secure the attention of the person in charge of purchasing. The district court determined that the defendants' conduct constituted a scheme to defraud under the mail fraud statute, and found the defendants guilty as charged.

The Second Circuit reversed the convictions. In the Second Circuit's view, although the agents' representations during the solicitation were " 'white lies' repugnant to 'standards of business morality,' " *id.* at 1179, the defendants' conduct did not constitute a fraudulent scheme under the mail fraud statute because the false representations made during the solicitations were not directed at the "quality, adequacy or price of the goods to be sold, or otherwise to the nature of the bargain." *Id.* at 1179.

In attempting to delineate the boundary line between puffing and fraud, the Second Circuit first explained that in discerning whether a particular practice constitutes fraud or an aggressive sales tactic, courts were to consider the realities of the market and contemporary business sales practice. *See id.* at 1178. The court then explained that mail fraud can only exist when the seller's representations mislead the buyer as to the quality or effectiveness of the product, or as to the advantages or future benefits accruing to the purchaser when such benefits cannot realistically be ascertained:

> The most nearly analogous cases sustaining convictions for mail fraud have involved sales tactics and representations which have tended to mislead the purchaser, or prospective purchaser, as to *the quality or effectiveness of the thing being sold, or to mislead him with regard to the advantages of the bargain which should*

*accrue to him. Thus claims or statements in advertising may go beyond mere puffing and enter the realm of fraud where the product must inherently fail to do what is claimed for it.* United States v. Andreadis, 366 F.2d 423 (2d Cir.1966), *cert. denied,* 385 U.S. 1001, 87 S.Ct. 703, 17 L.Ed.2d 541 (1967) (claim that "Regimen Tablets" could reduce weight without dieting contradicted scientific evidence); *United States v. New South Farm and Home Company,* 241 U.S. 64, 36 S.Ct. 505, 60 L.Ed. 890 (1916) (false representations regarding climate, ability to grow crops, and expected future improvements in promotion of land sales); *Wilson v. United States,* 190 F. 427 (2d Cir.1911) (sale of intrinsically worthless stock). And promotion of an inherently useful item may also be fraud *when the scheme of promotion is based on claims of additional benefits to accrue to the customer, if the benefits as represented are not realistically attainable by the customer.* United States v. Armantrout, 411 F.2d 60, 64 (2d Cir.1969) (carpet sold at inflated price on customer's expectation that defendant's "chain referral" scheme would return purchase price and produce profit for him); *United States v. Baren,* 305 F.2d 527 (2d Cir.1962) (promotion of knitting machines on representation that women customers could easily make complicated knitted garments for profitable resale, after it became known that average prospects could not so operate them).

*Regent,* 421 F.2d at 1180 (emphasis supplied).

Moreover, the *Regent* court rejected the government's contention that, even though the purchasers received what they bargained for, the sales tactics by the defendants' agents constituted a fraudulent scheme because the customers struck a bargain without knowledge of all of the facts. The government's contention was based in part on *United States v. Rowe,* 56 F.2d 747 (2d Cir.), *cert. denied,* 286 U.S. 554, 52 S.Ct. 579, 76 L.Ed. 1289 (1932). In *Rowe,* the Second Circuit held that the mail fraud statute is violated even when a person cheated out of his or her property by fraudulent representations receives consideration of equal value to that paid, because the person "has lost his chance to bargain with the facts before him." *Rowe,*

56 F.2d at 749. In rejecting the government's reliance on *Rowe,* the *Regent* court stressed that in order to constitute fraud in situations where the customer receives something of equivalent value for his or her payment, the injury contemplated by the schemer must be definable and involve facts material to the bargain:

> [W]e have found no case in which an intent to deceive has been equated with an "intent to defraud" where the deceit did not go to the nature of the bargain itself.... [W]here the representations do not mislead as to the quality, adequacy or inherent worth of the goods themselves, fraud in the bargaining may be inferable from facts indicating a discrepancy between benefits reasonably anticipated because of the misleading representations and the actual benefits which the defendant delivered or intended to deliver. In either instance, the intent of the schemer is to injure another to his own advantage by withholding or misrepresenting material facts.... [W]e believe the statute does require evidence from which it may be inferred that some actual injury to the victim, however slight, is a reasonably probable result of the deceitful representations if they are successful.

*Regent,* 421 F.2d at 1182. The *Regent* court viewed its holding as consistent with the holding of *Rowe,* because the false representations in *Rowe* concerned facts that were material to the bargain. *See Regent,* 421 F.2d at 1182.

Ultimately, the court in *Regent* concluded that the defendants had not conducted a scheme to defraud within the meaning of the mail fraud statute. Although the Court determined that the agents' misrepresentations were intended to deceive their customers, they were not intended to defraud them, because

> the falsity of their representations was not shown to be capable of affecting the customer's understanding of the bargain nor of the influencing his assessment of the value of the bargain to him, and thus no injury was shown to flow from the deception.

*Id.* at 1182. *Accord D'Amato,* 39 F.3d at 1257 & n. 4 (" 'the withholding or inaccurate reporting of information that could impact on economic decisions can provide the basis for' " mail fraud) (quoting *Wallach,* 935 F.2d at 463); *United States v. Schwartz,* 924 F.2d 410, 420 (2d Cir.1991) ("[T]he deceit practiced must be related to the contemplated harm, and that harm must be found to reside in the bargain sought to be struck."); *United States v. Starr,* 816 F.2d at 98, 100 (where defendant company was paid funds by customers to perform bulk mail service and company misappropriated funds for its own use but nevertheless did perform the service paid for, the customers were not defrauded under the mail fraud statute, because "[t]he misappropriation of funds simply had no relevance to the object of the contract; namely, the delivery of mail to the appropriate destination in a timely fashion.").

### 2. The Allegations of Mail and Wire Fraud in the Present Case.

The Petitioners contend that the Companies' representations concerning the "nomination" of the customer being solicited for membership, the "selectivity" of the nomination process, the reputation and quality of the Companies, and value of the registries and membership for business networking, the representations in the pitch sheets, and the many other representations cited by the government are not fraudulent within the meaning of the mail fraud statute. In the Petitioners' view, most of these representations are not false. In other cases, the representations are puffery and are a way of securing the attention of the customer, similar in all respects to the representations in *Regent* that were held not to constitute a basis for mail fraud. According to the Petitioners, the representations in this case cannot provide a basis for probable cause to seize the accounts, because the elements of the underlying crimes of mail and wire fraud—which require a scheme to defraud—cannot be established as a matter of law.

The Government disagrees, and contends that the representations are false, and in violation of the mail and wire fraud statutes. According to the Government, the Companies' false representations are directed at the quality, adequacy and price of the products being sold. Moreover, the Government contends that the alleged victim is made to bargain without facts that are essential in deciding whether he or she should enter into the transaction and purchase a membership. The Government believes that, based on the Complaint and hearing testimony, it has "more than amply" demonstrated probable cause.

Before discussing the allegations raised in the Government's Complaint, the Court believes it is necessary to state exactly what the "bargain" is in this case. The underlying transactions occur in the following sequence: a person, usually selected from a mailing list, is first contacted by a letter stating, among other things, that he or she has been "nominated" for inclusion in one of the registries by a member of the registry or by some other process, and that the nomination has been approved by some official committee, usually pending receipt of the biographical data form the nominee is asked to return. If the person responds by sending in the biographical data form, they are then solicited by telephone to purchase a membership. If they decline to purchase a membership, they may still be listed in the registry as a "Listee," provided there is space. The actual monetary transaction that would constitute the basis for a mail fraud claim, however, occurs when the membership is purchased.

■ The Court believes that the membership purchase transaction is the "bargain"—the exchange of mutual promises and consideration—that the customer enters into with the Company. In addition, the Court is of the view that this bargain entails not only purchasing membership in a registry that the member will be listed in and which will be sent to the member. A membership purchase also includes the availability of other services or products that either accompany the purchase free of charge, such as camera ready art with the Worldwide logo and a personalized plaque, or services that are extended to the member under the auspices of the Companies for a cost, such as a Gold MasterCard, a subscription to *Tribute* magazine, overnight airborne express at discount rates, telephone service at discount rates,

media/public relations services at discount rates, and use of a business center for networking. The Government acknowledges that these additional services were made available to members. *See* April 20, 1995 Tr. at 92–93, 97–98. Thus, any analysis of what is material to the "bargain" in this case must also consider the services and products represented as available to members.

With these caveats in mind, the Court will separately discuss each of the allegations specified in pages 25–29 of the Government's Complaint. To simplify matters and in order to parallel the Complaint's language, the Court shall refer to the Companies in the singular, as the "Company."

**1. The Company falsely represents to customers that it is a long standing, well known and recognized business which publishes highly selective, prestigious and authoritative biographical directories. In truth, the Company has only been in existence since 1989 and is the subject of frequent customer complaints regarding dishonest business practices. In addition, the Company's directories are neither highly selective nor well recognized and authoritative.**

■ In the Court's view, this allegation does not concern matters that are material to the bargain. Rather, like the statements made by the agents in *Regent,* these allegations concern matters that are intended to gain direct access to, and immediate acceptance by, the customer towards the Company or salesperson. The Court also believes that the Company's representations concerning its "long standing, well known and recognized business" which publish "highly selective, prestigious and authoritative biographical directories" are matters of opinion rather than fact. If a customer wants to, he or she can call the Better Business Bureau, find out more about the Company, and then form his or her own opinion about the Company's bona fides.

Moreover, the Court disagrees with the Government's view that the registry is not selective. In the Court's view, the mailing lists from which people are solicited for membership in the registry are selective. Such lists are utilized by many businesses today,

and constitute a significant aspect of marketing. These lists are purchased according to certain selective criteria, including criteria regarding the income and professional position held by the targeted customer. As Debra Benjamin stated in her affidavit, Worldwide targets high ranking managerial business and professional people.

> It is true that we choose most of our names from mailing lists, but the lists themselves are selective.... [W]e are demanding in what we ask for. We ask for industry-specific lists and specify certain titles within each of those industries. For example, in a health care industry list, we would ask for and accept only titles such as president, chairman, or chief of staff[.]

*Benjamin Affidavit,* ¶¶ 7–8. Inspector Biegelman testified that he was aware of the mailing lists' selectivity:

> Q Inspector Biegelman, where did the mailing lists come from?
>
> A List brokers and other mailing list companies.
>
> Q What were the criteria in the various mailing lists?
>
> * * * * * *
>
> A I do not know specific criteria.
>
> * * * * * *
>
> Q Do you know how the mailing lists were broken out?
>
> A I know in general how lists can be purchased, yes, sir.
>
> Q And do you know, that [sic] did you not, lists can be purchased from people at certain income level?
>
> A Yes.
>
> Q With people at certain positions?
>
> A Yes.
>
> Q And before you executed the search warrant, did you know that [sic] the basis of the mailing lists that were being used by Mr. Gordon's companies?
>
> A Specifically, no.
>
> * * * * * *
>
> Q Did you know whether the mailing lists targeted certain positions, jobs, positions, etcetera?

A Did I know for a fact, no. Did I believe so based on my review of the documents, yes. It appeared that he went after business people.

Q That he went after business people?

A Generally, yes.

April 20, 1995 Tr. at 101–102.

Finally, a breakdown of the titles of members and Listess in the Executive Club Registry reveals the selectivity of membership in the registry. Of the 74,557 members listed, approximately 70 percent are presidents, chief executive officers, financial officers or vice presidents of companies. *See* Post-hearing submission by Vivian Shevitz, dated April 24, 1995, at Exhibit D.

Accordingly, the Court finds that the statements regarding the Company's prestige and membership selectivity are to some extent true, and in any event do not constitute representations that are fraudulent within the meaning of the mail fraud statute.

**2. The Company falsely represents to customers in solicitation letters that they were nominated by one or more of the established members of Who's Who Worldwide and Sterling Who's Who for inclusion in its directories. In truth, customers are almost exclusively solicited from mailing lists purchased by the Company from outside sources.**

 It is the Court's view that the representations regarding nomination of members do not implicate matters that are material to the bargain. Rather, like the representations regarding prestige and membership selectivity, these representations are a tactic to gain the immediate attention of the customer. Further, the Court believes that the allegations in the Complaint concerning nominations are, in part, incorrect, because the solicitation letters state that candidates for inclusion in a registry are nominated either by members or by *some other process* that is selective. *See, e.g.,* solicitation letters dated July 9, 1992, October 29, 1992, December 15, 1994, and December 29, 1994, Government's Exhibit 2. Such "other process" could include use of selective mailing lists.

Moreover, the evidence presented to the Court indicates that some customers are, indeed, nominated by members. In her affidavit, Debra Benjamin states that,

[w]e also obtain names for potential new members through nominations by our current membership (nominating ballots periodically are sent to our members and also are included in Tribute Magazine). We kept the faxed and mailed nominations of other persons by our current members in a binder in the office.

*Benjamin Affidavit,* ¶ 9. A review of the issues of *Tribute* magazine included in the Petitioners Exhibit A–1 accompanying their Order to Show Cause, reveals that two of the three issues contain membership nomination ballots. *See Tribute,* Vol. 5 1995, at 63; *Tribute,* Vol. 4 1994, at 48. In the tape recording that is the Government's Exhibit 6, the soliciting salesperson repeatedly makes references to sending the customer nomination ballots for the customer to nominate new members upon purchase of a membership.

Significantly, at the hearing the Government did not dispute that some candidate nominations were made by members. In fact, Inspector Biegelman testified that some members did nominate other potential members:

Q There are in fact nominations by established members, aren't there?

A Very few.

Q Have you counted them up?

A No, I have not.

Q Do you know of the members that are in the directory that is before you, how many were nominated by other members?

A No, I do not[.]

April 20, 1995, Tr. at 98–99.

Accordingly, the Court finds that the statements concerning nominations were mischaracterized by the Government in the Complaint. The actual statements in the solicitation letter, while misleading to some extent, were in part truthful. In the Court's view, the statements are nothing but sales hyperbole and do not constitute representations that are fraudulent within the meaning of the mail fraud statute.

**3. The Company falsely represents to customers in solicitation letters that**

their inclusion in the Company's directories is without cost or obligation on the part of the customer. In truth, customers must purchase a membership to be listed in the Company's directories.

■ Until December, 1994, the solicitation letters sent by the Company included a postscript which stated in relevant part: "There's no cost or obligation on your part for your inclusion in the Who's Who Registry." The postscript then instructs the nominee to complete an enclosed biographical data form, for "accuracy and publication" purposes. The Court believes that there is nothing fraudulent about this representation.

Essentially, in order to be listed in the registry, a nominee had to be (i) confirmed and (ii) had to return the biographical data form. If the nominee subsequently chose to purchase a membership, they would be listed in one of the member categories of the registry. If the nominee chose not to purchase a membership, than they would be listed in the registry under the category as "Listees," as space permits. *See* Benjamin Affidavit at ¶ 11. In fact, a review of the Executive Club Registry reveals nine and one half pages of closely-spaced Listees. Thus, in the Court's view, the representation that there is "no cost or obligation" to be listed in the registry is not false, because one did not have to purchase a membership to be listed.

Moreover, however, misleading, in the Court's view the representation does not concern anything material to the bargain, because the Company makes it very clear at the time of the membership solicitation that a membership costs money.

Accordingly, the Court finds that although the postscript statement may be misleading, it does not constitute a representation that is fraudulent within the meaning of the mail fraud statute.

**4. The Company falsely represents to customers in solicitation letters that the majority of new candidates who are nominated are not accepted for inclusion. In truth, anyone who is willing to purchase a membership is accepted.**

■ The solicitation letters generally include a sentence stating that "since the ma-jority of new candidates who are nominated are not accepted for inclusion, we wish to extend our congratulations for this coveted event." In the Court's view, this statement, although misleading, is pure sales hyperbole, directed at gaining the customers' attention. For reasons similar to those stated in discussing the representations concerning nominations in allegation 2, above, the Court does not believe that the representation is fraudulent in any way that is material to the bargain.

**5. The Company falsely represents to customers in solicitation letters that its Office of Public Affairs or Board of Review evaluates nominees in accordance with specific standards of achievement. In truth, there is no Office of Public Affairs or Board of Review at the Company that evaluates customers' specific standards of achievement.**

■ A review of the solicitation letters submitted by the Government indicates that, after informing the nominee that he or she has been nominated as a candidate for inclusion in the registry, the letters represent that the nomination has been "confirmed" by the Office of Public Affairs. In some instances the representation is qualified by adding that the nomination is confirmed "pending" receipt of additional biographical data from the nominee.

The Government contends that there is no Office of Public Affairs. The Petitioners have submitted the affidavit of Elizabeth Mary Saunter ("Saunter"), supervisor of the administrative staff at Worldwide, in which she states that part of her duties entail "supervis[ing] the employees who, as part of our Office of Public Affairs, receive incoming phone calls from members." Saunter also states that "[t]here are other staff in the Office of Public Affairs, not supervised by me, who conduct interviews of potential members." Saunter Affidavit, ¶ 2, attached to Exhibit B of the Shevitz Declaration. At the hearing, the Government did not make any attempt to disprove Saunter's statement or otherwise show that there is not an Office of Public Affairs.

Moreover, even if there was not such an office, in the Court's view the representation is not material to the bargain and, like the other representations discussed above, concerns gaining the attention of the nominee. Accordingly, this statement does not constitute a representation that is fraudulent within the meaning of the mail fraud statute.

**6. The Company falsely represents to customers in solicitation letters the identity of the sender of the letters. The numerous letters sent to customers since at least 1990 are signed on behalf of the Company in the names of fictitious persons.**

■ In the Court's view, there are valid business reasons for signing the letters using fictitious names—such as privacy or preventing harassing phone calls—, and a similar practice was found not to be part of a fraudulent scheme in *Regent. See id.*, 421 F.2d at 1176–77 (agent represented that he or she was a doctor or other professional person). Again, this statement is collateral to any of the material aspects of the bargain, and does not amount to a fraudulent representation within the meaning of the mail fraud statute.

**7. The Company falsely represents that members of its directories like to anonymously nominate potential new members of the directory. In truth, the names of virtually all the individuals contacted by the Company are obtained through mailing lists purchased by the Company.**

■ For the reasons given with regard to allegations 2, 4 and 5 above, the Court believes that this statement does not constitute a representation that is fraudulent within the meaning of the mail fraud statute.

**8. The Company falsely states that an exclusive committee at the Company decides who will be accepted for membership, based on the candidate's individual achievements. In truth, customers are accepted for inclusion in one of the Company's directories based on one criteria: whether they agree to purchase a membership.**

■ In the Court's view, the Government incorrectly alleges in the Complaint that in-clusion in a registry is based on one criteria, namely whether the nominee agrees to purchase a membership. As explained above in discussing allegations 1, 2 and 3, inclusion in a registry involves a particular kind of selective process. By predominantly basing membership nomination on selective mailing lists, the criteria for inclusion in the registry include income and professional status, among other things. Thus, as explained above, the majority of members listed in a registry are high-level corporate professionals.

Moreover, in the Court's view the representation that "an exclusive committee at the Company decides who will be accepted for membership," is another example of an ambiguous statement aimed at obtaining the nominee's attention, and does not implicate a material aspect of the bargain struck when a nominee purchases a membership.

Further, the Court is not persuaded by the Government's allegation that during 1994 and 1995, confidential informants posing as dentists, policemen, office managers, sales managers, printers and delicatessen owners called Worldwide or one of the other Companies and obtained memberships after a short interview over the phone, even though they were not a company president, vice president or chief executive officer. The Court believes that it is reasonable for a salesperson to consider a dentist, sales manager, printer or delicatessen owner to be an entrepreneur or executive, and desirable for inclusion in the registry.

Accordingly, this statement also does not constitute a representation that is fraudulent within the meaning of the mail fraud statute.

**9. The Company falsely represents to customers who have been "nominated" for membership that their names were not obtained from mailing lists. In truth, the names of virtually all the individuals contacted by the Company are obtained through mailing lists purchased by the Company.**

For the reasons given with regard to allegations 1, 2 and 7 above, the Court believes that this statement does not constitute a

representation that is fraudulent within the meaning of the mail fraud statute.

10. **The Company falsely represents to customers that it does not solicit new members for its directories. In truth, the Company employs a large, full-time sales force to solicit new customers to become members and to purchase the Company's directories. In fact, salespeople are required to meet rigid sales quotas to avoid being fired.**

 In the Court's view, despite the obvious falsity of the statement—for example, the Company admits that it solicits new member nominations from existing members—this representation is not material to the bargain struck by a nominee in purchasing membership, and, therefore, does not constitute a representation that is fraudulent within the meaning of the mail fraud statute.

11. **The Company falsely states to customers that it is a member-owned and member-run organization. In truth, the Company is owned and operated by Bruce Gordon. Members have no ownership interest in the Company and have no say in how it is run.**

 Neither the solicitation letters nor the pitch sheets contain the representation that the Company is "member-owned." This representation was made during a telephone interview with one of the CIs. The Court believes that the representation is not material to the bargain, because a person purchasing a membership is never told (and the Government has not made the allegation) that membership includes purchasing equity in the Company. Rather, the Court views the statement as sales hyperbole.

With respect to the allegation that the Company is member-run, it is the Court's view that the term "member-run" is a vague and relative term; participation in the events sponsored by the Company or input into operations by members can be reasonably construed as participating in a "member-run" organization. Accordingly, this statement does not constitute a representation that is fraudulent within the meaning of the mail fraud statute.

12. **The Company falsely represents that potential members must engage in a qualifying interview to prove they are a leading person in their profession. In truth, the qualifying interview is a ruse to gain the customer's confidence, so that an attempt can be made to sell the customer a membership and other Company products. In fact, customers interviewed are rarely disqualified so long as they do not object to the sales pitch, or are willing to purchase Company products.**

Despite the Government's description of the interview, the fact of the matter is that a potential member is interviewed to some extent to determine whether they "qualify" for membership. Also, for the reasons given with regard to allegations 1, 2, 4, 5 and 8 above, the Court believes that this statement does not constitute a representation that is fraudulent within the meaning of the mail fraud statute.

13. **The Company makes misleading statements in telephone pitches to customers regarding the involvement of famous people with the Company. For example, Barbara Walters of "20/20" and Russian President Boris Yeltsin, are described as members of the Company's directories. In fact, neither has ever had any involvement with the Company.**

 The representation that Barbara Walters and Boris Yeltsin are members of Worldwide does not appear on any of the pitch sheets or the solicitation letters sent to nominees. Rather, the representation was made by one or more salespersons in the course of a telephone solicitation recorded by the Government.

With respect to the Yeltsin representation, Margaret Swendseid, the Managing Editor of *Tribute*, has submitted an affidavit stating that the salesperson who made the representation was not authorized to do so, and was fired. *See* Swendseid Affidavit, attached as Exhibit B to the Shevitz Declaration. The Court also notes that while Boris Yeltsin may not be a member, the Prime Minister of the Republic of Lithuania and the President of the Republic of Kalmykia are members who have been featured in *Tribute* magazine. *See*

*Tribute,* Vol. 3, 1994 at 11 and Vol. 5, 1995 at 11, submitted as part of Petitioner's Exhibit A–1.

Assuming that the Walters representation is also false—the Petitioners have stated in a letter to the Court dated May 4, 1995 that Walters did in fact accept a free membership to one of the registries—the Court notes that during his testimony, Inspector Biegelman acknowledged the ultra vires nature of the representations concerning Walters and Yeltsin:

Q The 85 tapes that you have, calls made by CIs, cooperating individuals, etcetera, those calls were made by prospective members, correct?

A That's correct.

Q Those calls were made by people who, if it was different, tell me, who called the company and said I have got a nomination letter, right?

A Basically, correct.

Q And the response from the person in the company was this as you said, according as you testified, according to a script, right?

A A script and also enhancement from that script. *Many of the things said to the confidential informants by the salespeople were things I've never seen in any of the scripts. There were other things said in addition.* For example, the Boris Yeltsin statement was not in any script that I ever seen yet it was said that he was a member.

\* \* \* \* \* \*

Q Were you aware that certain people were fired by Mr. Gordon for saying things that were unauthorized and untrue?

A I heard some of that. May I ask who you are referring to?

April 20, 1995 Tr. at 82–83 (emphasis supplied).

In the Court's view, the transgressions of a salesperson who did not follow the written pitch sheets and who was subsequently fired does not render these representations as fraudulent within the meaning of the mail fraud statute.

**14. The Company makes false and misleading statements to customers con-cerning the directory's closing, printing and shipping dates to pressure customers into a quick sale. In truth, customers are frequently told months in advance of any printing deadlines that the deadline for inclusion in the directory will expire shortly.**

■ Unfortunately, current sales tactics utilize pressure as a method to effect an immediate sale of the product or service. Whether it is buying a car or purchasing stock, the broker or salesperson will often be heard to say that the product or sale will not be available beyond the end of the day or hour, and that the purchaser would be wiser to make the purchase "now." The Court finds nothing in this tactic concerning a directory's closing, printing or shipping date to be a fraudulent representation within the meaning of the mail fraud statute.

**15. The Company falsely represents to customers that memberships are limited, that they are not always available and that new openings come about only through the attrition of existing members. In truth, there is no limitation on the number of memberships and the availability of memberships is not based on attrition, but rather on the ability and willingness of a customer to pay the membership fee.**

■ In the Court's view, the statement that membership in a registry is "limited," is one of opinion, and is similar to the statement suggesting that membership is a "coveted event." Moreover, the Court believes that the remaining statements are a tactic to obtain an immediate membership purchase. For the reasons given with regard to allegations 1, 2, 4 and 14 above, the Court believes that these statements do not constitute representations that are fraudulent within the meaning of the mail fraud statute.

**16. The Company falsely represents that the offer of a membership is a once-in-a-lifetime event and that once a membership is declined, the customers must be re-nominated if they wish to be considered for membership again. In truth, anyone can become a member at any time if they are willing to pay the membership fee. In addition, the Company**

frequently re-contacts customers who have declined a membership in order to try to sell them a less expensive membership.

For the reasons given with regard to allegations 1, 2, 4 and 10 above, the Court believes that these statements constitute sales hyperbole, and are not representations that are fraudulent within the meaning of the mail fraud statute.

**17. The Company falsely represents that, when a customer agrees to become a member, a press release announcing his membership will be sent to each of the other members. In truth, such press releases are not sent to other members.**

The representation does not appear on any of the pitch sheets or the solicitation letters sent to nominees. Rather, the representation was made by one or more salespersons in the course of a telephone solicitation recorded by the Government. In the Court's view, this representation is collateral to the bargain struck by the membership purchaser, and is not material. The Court believes that the statement does not constitute the kind of false representation that is actionable under the mail fraud statute.

**18. The Company falsely represents to customers that its directories are invaluable tools for networking among members. In truth, the directory does not contain home or work telephone numbers nor zip codes, which makes it virtually useless for any networking purposes.**

▮ The Court finds this allegation by the government to be superficial and troublesome. In the Court's view, the allegation is Inspector Biegelman's opinion, *see* April 20, 1995 Tr. at 89–90, and inappropriately replaces the membership purchaser's estimate of the value of a membership with the Government's own estimate of that value.

Contrary to the Government's contention, the absence of telephone numbers and zip codes does not make the registry "virtually useless." The are valid business reasons for excluding someone's home and business phone from the listing, and the absence of a zip code from an address will not necessarily

prevent a letter from being delivered. The registry lists the member's business address, and it is a relatively simple exercise to dial directory assistance and obtain the phone number. Moreover, the CD ROM version of the directory contains the zip codes. *See* April 20, 1995 Tr. at 89.

Another misconception in the Government's understanding of the networking usefulness of the registry is in its belief that networking involves only the ability to contact someone. According to Inspector Biegelman, "the importance of networks is to contact other people" and "[t]he easiest way to contact other people is to pick up a phone and call somebody." April 20, 1995 Tr. at 90. However, knowing whom to contact is as important in today's business networking as is making the contact. The registries at issue provide more utility with regard to this aspect of networking, than perhaps they do with actually making the contact, because they list professional and biographical data of the member. The Government may not credit this information, but to the creative entrepreneur seeking to contact a specific audience, knowing, for example, where executives in a certain industry prefer to vacation or what their favorite hobbies are can lead to a wealth of business opportunities. A creative mind can discover many marketing applications in the biographical data accompanying the member listing, and, contrary to the Government's conclusion, there are many networking possibilities arising from the information provided in the registries.

In addition, there are other services provided by the Company conducive to networking that the Government apparently overlooked in this regard, such as *Tribute* magazine, cocktail parties, and the availability of the registry on CD ROM. The Government admits that these services were made available to members. *See* April 20, 1995 Tr. at 92–93, 97. In the Court's view, the registries and accompanying services offered by the Company clearly establish that there are real, viable business networking opportunities incident to membership in the Company's registries. This conclusion is further supported by the affidavits of several members who attest to the networking value and

usefulness of the registry and other services provided by the Company for members. *See, e.g.,* Affidavit of Marjorie Beck; Affidavit of Twila C. Ligget, Ph.D; Affidavit of Robert E. Drake; Affidavit of Daniel J. Pilla; and Affidavit of Gary Reinl, attached to Exhibits D and E of the Shevitz Declaration.

What is particularly troublesome to the Court about this allegation, however, is how the Government can commence a criminal prosecution and seize assets with devastating pecuniary effects, in part, merely on its opinion that the networking opportunities offered by the Company is fraudulent. That opinion is based on nothing more than *the Government's* estimate that the value of the services offered by the Company is worthless. In *D'Amato,* the Second Circuit admonished that this sort of substitution of the purchaser's estimate of value is "seriously misguided." *See id.,* 39 F.3d at 1261–62 (declining to find lack of value and infer fraudulent intent under the mail fraud statute on the part of an attorney who accepts a retainer arrangement but is not called upon to perform services). The Court believes that in this case, the Government has made unfair and exaggerated statements in the Complaint, such as that the networking value of membership in a registry is "virtually useless," in order to bring this case within the ambit of the mail fraud statute.

The Court also believes that different kinds of "value" other than networking opportunities can be derived from membership, and that the Government has also overlooked this value in its somewhat subjective and superficial estimation of the value of a registry listing. For example, a member, or even a Listee, can derive value just from being listed in a registry. This value can arise from the ability to put on their resume that they are listed in Who's Who Worldwide, or from prominently displaying the registry plaque for all who enter their office to see. This Court cannot say that some prominent business executives may not find value in making the $400 dollar investment to purchase a five-year membership or $250 to purchase an associate membership and be listed in a registry, on the possibility that it

may lead to a contact and a subsequent lucrative business opportunity.

Finally in this regard, evidence was also introduced at the hearing that members send notices of changes in address so that they can continue to hear from the Company, *see* April 20, 1995 Tr. at 105–07, marked as Defendants Exhibit B, and the Petitioners contend that approximately 5,000 members have upgraded or renewed their membership. *See* post-hearing letter submission of Vivian Shevitz, dated April 24, 1995 at 2.

Although the Government contends that it received complaints from members claiming to have been defrauded, Biegelman's testimony indicates that in reality, of the 1,539 questionnaires he sent out to members, only 123 questionnaires were actually returned filled out. *See* April 20, 1995 Tr. at 104, and the Supplemental Declaration of Martin Biegelman dated April 26, 1995, at ¶ 4, attached as Exhibit 1 to the Government's post-hearing submission dated April 26, 1995. Of these 123 returns, Biegelman testified that only thirty actually stated that they paid money to the Company and felt defrauded. April 20, 1995 Tr. at 109–110. The Court does not believe that these complaints, entailing a very small percentage of solicitees and members, can establish the basis for the criminal mail fraud charge in this case, because among the other reasons cited above, the Company's policy—admitted to by Biegelman—is to reimburse dissatisfied members. *See* April 20, 1995 Tr, at 113, and Saunter Affidavit at ¶ 8.

Accordingly, the statement to customers that the Company's registries are invaluable tools for networking among members cannot form the basis of a fraudulent misrepresentation within the meaning of the mail fraud statute, because among other reasons, the Government has failed to show that the representation is false.

**19. The Company falsely represents that it sponsors conferences and seminars in foreign countries or at posh resorts, where members can meet and network with each other. Customers are told, for example, of successful and well-attended conferences on international trade in Hong Kong and Vietnam, and**

of a golf and tennis networking event in Hilton Head, South Carolina. In truth, no such conferences or events were ever held or sponsored by the Company.

■ In the Court's view, these representations do not establish that the Company committed mail fraud, because the evidence reveals that the Company intended to carry out the promise to hold these conferences, but due to lack of interest had to cancel them.

With respect to the event at Hilton Head, the advertisements and brochures submitted by the Petitioners shows that Who's Who Executive Club intended to hold the networking conference from November 3, 1994 through November 6, 1994. Among other places, the event was advertised in *Tribute* magazine, and registration forms were made available to members. A letter dated March 22, 1994 between officials at Hilton Head and Ms. Swendseid of Worldwide reveals that by March 22, 1994 an itinerary and program was being formulated. *See* Exhibit F to the Shevitz Declaration. According to Debra Benjamin, the event was cancelled because not enough reservations were received by the deadline. Benjamin Affidavit at ¶ 5. Biegelman admitted that his investigation corroborated the evidence submitted by the Petitioners about this event, *see* April 20, 1995 Tr. at 53. Significantly, the Government never offered any evidence to show that the representations about the Hilton Head weekend were made with the intent of never carrying them out, or with the intent of not providing any of the events the advertisement for the weekend stated would be available.

Similarly, the trip to Vietnam and Hong Kong was cancelled because no one signed on to go. Benjamin Affidavit at ¶ 5. The Government did not offer any evidence at the hearing that the Company never intended to follow through on the trip.

Accordingly, in the Court's view the representations regarding these two events are not false, and cannot provide a basis for violation of the mail fraud statute.

In addition to these 19 allegations, the Government raises two additional bases to support its charges of mail and wire fraud.

The first concerns the Government's contention that fraud has been established in this case on the basis of Judge Jordan's findings in the civil trademark infringement suit brought against Worldwide by Reed Elsevier. The Court does not believe that these findings establish a basis for probable cause that the criminal mail and wire fraud statutes have been violated, whatever the merits of the civil infringement suit.

■ First, a finding in a trademark infringement suit that a false description or designation of origin deceives the consumer does not establish that the deception is fraudulent within the meaning of the criminal mail fraud statute. *See, e.g., Naso v. Park,* 850 F.Supp. 264, 274–75 (S.D.N.Y.1994) (a false designation of origin or trademark infringement does not constitute fraud within the meaning of the mail fraud statute unless the infringer actually misrepresents that the infringing mark is the original mark or originated from the original mark's owner); *United States v. LaMacchia,* 871 F.Supp. 535, 545 (D.Mass.1994) (copyright infringement cannot be prosecuted under the mail or wire fraud statute) (citing *Dowling v. United States,* 473 U.S. 207, 227–28 & n. 20, 105 S.Ct. 3127, 3138 & n. 20, 87 L.Ed.2d 152 (1985)). Indeed, the *Regent* court stressed that false statements can intend to deceive people without intending to defraud them in violation of the mail and wire fraud statutes. *See Regent,* 421 F.2d at 1182.

■ Second, Judge Jordan's findings in the trademark infringement action do not have a preclusive effect in this proceeding. In order for the findings in the civil case to operate preclusively as to the issue of mail fraud in this case, the issues regarding fraud in both cases must be identical, and Worldwide must have had a full and fair opportunity to litigate the mail fraud issue in the civil action. *See Central Hudson Gas & Elec. Corp. v. Empresa Naviera Santa S.A.,* 56 F.3d 359, 368–69 (2d Cir.1995) (setting forth the elements of collateral estoppel). Here, the issues regarding fraud are not the same in both cases. Deception in the context of a false designation or description of origin is different from the intentional fraud perpe-

trated to obtain someone's money or property that is actionable under the criminal fraud statute. Moreover, Worldwide did not have the opportunity in the trademark infringement suit to defend itself against a charge that its operations constituted a scheme or artifice to defraud within the meaning of the criminal mail and wire statutes.

■ The other additional basis for finding fraud raised by the Government concerns alleged misrepresentations regarding the plaque that accompanies purchase of a membership. In the tape recording that is Government's Exhibit 7, a salesperson at Sterling represents to the caller that the plaque is "black marble." In reality, the plaque is made of metal and wood, and has a faux marble appearance. A review of all of the pitch and objection sheets reveals that the plaque is never described as made of marble. Additionally, in the tape recording that is Government's Exhibit 6, the salesperson represents to the caller that the plaque is "a beautiful plaque engraved with your name." Based on all of evidence, the Court finds that a false description of the plaque as "marble" in the course of an aggressive sales pitch by a salesperson is not sufficient to constitute mail fraud, particularly in light of the fact that Company supervisors listen in on salespersons' solicitations, and fire salespersons who make statements not contained in the pitch sheets that are false. *See* April 20, 1995 Tr. at 84, and Exhibit C to the posthearing letter submitted by Vivian Shevitz, dated April 24, 1995.

### 3. The Government Has not Established Probable Cause.

■ Based on the above reasons and findings, it is the Court's determination that the Government has not established probable cause that the bank accounts at issue are subject to forfeiture. On the facts and evidence presented to the Court, even construed in the favorable light required, the Government has not shown anything other than mere suspicion that the elements of mail and wire fraud exist in this case. The representations made by the salespersons that form the crux of the Government's Complaint do not constitute a scheme or artifice to defraud, either singly or in the aggregate, and the Government has failed to meet its burden that the representations can be reasonably construed to constitute such a scheme.

In the Court's view the representations cannot be equated with an intent to defraud. To begin with, some of the alleged representations set forth in the Complaint are not false. With regard to other alleged statements, although false or deceiving, the representations are not material to the bargain struck between the membership purchaser and the Company. These representations, even when taken in the totality of the circumstances, are mainly directed at obtaining the customer's interest and gaining his or her immediate attention. They are not directed at "the quality, adequacy or price of the goods," nor do they concern facts "essential in deciding whether to enter the bargain." *Regent,* 421 F.2d at 1182.

Nor in the Court's view can one infer fraud from these representations on the basis of "a discrepancy between benefits reasonably anticipated because of the misleading statements and the actual benefits which the defendant delivered, or intended to deliver." *Id.* The customer received exactly what he or she paid for when they purchased a membership. They were sent everything they were told they would be sent, and the services offered by the Companies were made available to the member. If the member was dissatisfied, the Companies attempted to remedy the situation, including providing refunds. Significantly, the networking value of membership was there for the member to utilize.

■ In effect, what the Government did in this case was to take every minute transgression and ambiguous statement by a salesperson attempting to sell a registry membership, and combine such statements into a Complaint that unfairly exaggerates the Companies' conduct. In their totality, the number of misleading statements can be construed to superficially resemble a criminal fraud, and the Court can easily understand how the Magistrate Judge, presented only with the Government's Complaint and contentions on an *ex parte* and expedited basis,

could have believed that there was probable cause that mail and wire fraud were committed. A closer look at the evidence however, after a hearing, reveals otherwise. The fact that the Companies' sales approach generally involved grandiose and misleading statements, innuendo and puffery, does not warrant the conclusion that they committed criminal fraud. The court in *Regent* explained that "courts cannot dwell in their ivory towers without descending occasionally into the market place," to observe the day to day practices of merchants. *Regent*, 421 F.2d at 1178. Regretfully, a descent into today's telemarket world reveals that sharp sales techniques exist and *caveat emptor* is still the rule.

For the reasons stated above, the warrant of seizure must be vacated, and the Petitioners' funds in the seized bank accounts must be immediately released. Having decided that the Government has failed to establish probable cause, and indeed, that the crimes of mail and wire fraud have not been committed, the remaining issues raised by the parties need not be addressed. If the Petitioners wish to pursue a claim for damages against the Government, they must commence a new action.

## CONCLUSION

Because of the ease the Government can seize property using the forfeiture statutes and the potential hardship such a seizure can cause to an innocent owner of the property, the Second Circuit has stated on more than one occasion that the district courts must be vigilant in ensuring that constitutional and procedural safeguards remain intact. *See Daccarett*, 6 F.3d at 46, 59; *Statewide*, 971 F.2d at 905. The court also stated in the same breath, however, that despite the civil forfeiture law's "apparent unfairness" to claimants who have been deprived of their property, "the precedents of this court and the Supreme Court, as well as the relevant statutes and rules, seem to require this result." *Daccarett*, 6 F.3d at 56.

The Court has attempted to be vigilant, and has put aside other pressing matters in order to hear the parties and quickly arrive at what it believes is the legally appropriate resolution in this case. While the fungible nature of the Petitioners' bank accounts may have qualified as an exigent circumstance under the recent decision by the United States Supreme Court in *United States v. James Daniel Good Real Property,* —— U.S. ——, 114 S.Ct. 492, 126 L.Ed.2d 490 (1993), thus permitting an *ex parte* seizure, nevertheless the Court continues to be troubled by the present seizure because the evident lack of probable cause is revealed once the superficiality of the Government's Complaint is penetrated. The Supreme Court in *James Daniel Good,* —— U.S. at ——, 114 S.Ct. at 505, and the Second Circuit in *Statewide*, 971 F.2d at 905, suggest that measures less restrictive than *ex parte* seizure, which suffice to protect the Government's interest, are favored. Perhaps such measures should have been sought in this case.

It is hereby

**ORDERED,** that the Petitioners' motion is granted, to the extent that the seizure warrant in case M 95–523 is vacated, and the funds and accounts seized pursuant to that seizure warrant are to be released forthwith, and is denied in all other aspects; it is further

**ORDERED,** that the temporary restraining order against the United States and the United States Postal Service imposed in this case is vacated; it is further

**ORDERED,** that the Petitioner's motion for an accounting of damages is denied without prejudice to their right to seek such relief by commencing a new action; and it is further

**ORDERED,** that the Assistant United States Attorneys involved in this case and all other counsel who have appeared in the related criminal cases are directed to appear before the Court for a status conference on Tuesday, June 6, 1995 at 9:00 a.m., in order to discuss the disposition of the pending criminal cases related to this forfeiture.

**SO ORDERED.**